STATE, Respondent, v. BLAISDELL, and another, d/b/a Lloyd Electric Service, Inc., Appellants.

Supreme Court

*No. 76–227–CR. Argued September 7, 1978.—*
*Decided October 3, 1978.*
(Also reported in 270 N.W.2d 69.)

For the appellants there were briefs by *Howard B. Schoenfeld* and *Peregrine, Marcuvitz, Cameron & Peltin, S.C.* of Milwaukee, and oral argument by *Mr. Schoenfeld.*

For the respondent the cause was argued by *Marguerite M. Moeller,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

DAY, J.   This is an appeal from judgments convicting the appellants, Terry Blaisdell and William Utech (hereafter defendants), doing business as Lloyd Electric Service, Inc.; of theft by subcontractor, party to a crime, in violation of secs. 289.02(5), 943.20(1)(b) and (3)(c) and 939.05, Stats., and to review orders denying defendants' motions for a directed verdict of dismissal and acquittal and for judgment notwithstanding the jury verdict or, in the alternative, for a new trial.

The question is whether there was sufficient credible evidence for the jury to convict the defendants of theft by subcontractor beyond a reasonable doubt. We conclude that there was.

The defendants, Terry Blaisdell and William Utech were the principal officers of Lloyd Electric Service, Inc., an electrical contracting company. Mr. Blaisdell was president and Mr. Utech was secretary of the corporation. On November 20, 1973, Douglas Dynamics Corporation, as owner, contracted with Megal Construction Corporation as general contractor to construct an addition to the owner's property in the city of Milwaukee. Megal fulfilled its obligations as general contractor and was paid in full for its work. Megal in turn contracted with Lloyd Electric to do the electrical work on this particular project. The contract price was $22,896 which was paid by Megal to the defendants in eight installments beginning in April, 1974 and ending August 20, 1974.

Standard Lamp furnished the electrical supplies to Lloyd Electric for the Douglas Dynamics project starting March 18, 1974 through June 4, 1974. The defendants owed Standard Lamp $3,092.01 for materials supplied for that particular project. Standard Lamp was never paid for the Douglas Dynamics project, according to the president of Standard Lamp, who testified on behalf of the state. He testified that Standard Lamp and Lloyd Electric had been doing business with each other since 1969 and that Lloyd Electric began to fall behind in paying its bills as of November, 1973. The deficit continued through November, 1974 when Lloyd Electric went into receivership. The delinquent balances grew larger during 1975 so that the defendants owed more to Standard Lamp at the end of the Douglas Dynamics project than they did at the beginning of the project. The president of Standard Lamp testified that Lloyd Electric had two types of accounts with Standard Lamp. One was a general running account and the other was a special account for a project in Oconomowoc known as the Scotsland project. The Scotsland project was broken down into a number of smaller jobs.

All undesignated payments made to Standard Lamp by Lloyd Electric were credited to the regular open account and were used to pay off the oldest invoices first. According to the president of Standard Lamp the defendants could direct that payments be applied to specific jobs and they were aware that they could do so. In some cases, the defendants did, in fact, designate that payment be made to a specified account. The testimony was to the effect that it was up to the defendants to designate to which account a particular payment was to be applied and that in the absence of such designation any money paid was merely applied to the oldest outstanding account.

During August and September of 1974, Lloyd Electric paid Standard Lamp checks totaling $18,000, none of

which was designated for a specific account. On October 1, 1974, Lloyd Electric gave Standard Lamp a check for $274.81, designated as payment on the Inland Diesel job. On October 23, 1974, Lloyd Electric gave a check for $3,-000 to Standard Lamp designated for the Northridge account. This was the last payment which Lloyd Electric made to Standard Lamp.

The defendants were convicted in a jury trial of violating sec. 289.02(5), Stats. 1973.[1] The defendants were each fined $5,000.

Under sec. 289.02(5), Stats., all monies paid by an owner to a contractor or subcontractor become a trust fund until all claims by suppliers of labor and materials

[1] "THEFT BY CONTRACTORS. The proceeds of any mortgage on land paid to any prime contractor or any subcontractor for improvements upon the mortgaged premises, and all moneys paid to any prime contractor or subcontractor by any owner for improvements, constitute a trust fund in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor and materials used for the improvements, until all the claims have been paid. The use of any such moneys by any prime contractor or subcontractor for any other purpose until all claims, except those which are the subject of a bona fide dispute and then only to the extent of the amount actually in dispute, have been paid in full or pro rata in cases of a deficiency, is theft of moneys so misappropriated and shall be punished under s. 943.20. If the prime contractor or subcontractor is a corporation, such misappropriation also shall be deemed theft by any officers, directors or agents of the corporation responsible for the misappropriation. Any of such misappropriated moneys which have been received as salary, dividend, loan repayment, capital distribution or otherwise by any shareholder of the corporation not responsible for the misappropriation shall be a civil liability of the shareholder and may be recovered and restored to the trust fund specified in this subsection by action brought by any interested party for that purpose. Until all claims are paid in full, have matured by notice and filing or have expired, such proceeds and moneys shall not be subject to garnishment, execution, levy or attachment." ·

used in the improvements have been paid. Violation of the statute is punishable under sec. 943.20(1) (b), Stats. 1973[2] as theft by a trustee. To sustain a conviction under sec. 289.02(5), Stats., the state must prove beyond a reasonable doubt that the defendants intended to defraud just as it would in a prosecution for theft. *Pauly v. Keebler,* 175 Wis. 428, 436, 185 N.W. 554 (1921).

Citing *State v. Halverson,* 32 Wis.2d 503, 509, 145 N.W.2d 739 (1966) and Wis. J. I.—Criminal sec. 1444— Theft by Employee, Trustee, or Bailee (Embezzlement), the defendants summarize the four elements of the crime as (1) that the defendant by virtue of his office as trustee had possession, or custody of money of another obtained because of his office, business or employment; (2) that the defendant intentionally used, concealed or retained possession of such property without the owner's consent and contrary to the defendant's authority; (3) that the defendant knew that such concealment or such retention of such money was without the owner's consent and contrary to the defendant's authority; and, (4) that the defendant retained possession of such money with intention to convert it for his own use.

---

[2] **"Theft.** (1) ACTS. Whoever does any of the following may be penalized as provided in sub. (3):

". . .

"(b) By virtue of his office, business or employment, or as trustee or bailee, having possession or custody of money or of a negotiable security, instrument, paper or other negotiable writing of another, intentionally uses, transfers, conceals, or retains possession of such money, security, instrument, paper or writing without the owner's consent, contrary to his authority, and with intent to convert to his own use or to the use of any other person except the owner. A refusal to deliver any money or a negotiable security, instrument, paper or other negotiable writing, which is in his possession or custody by virtue of his office, business or employment, or as trustee or bailee, upon demand of the person entitled to receive it, or as required by law, is prima facie evidence of an intent to convert to his own use within the meaning of this paragraph."

The defendants do not contest the sufficiency of the evidence to prove the first element of the offense. The evidence introduced at trial clearly shows that Douglas Dynamics contracted with Megal Construction Company to build an addition to the Douglas Dynamics plant, that Megal was paid in full and that Megal in turn paid Lloyd Electric in full as a subcontractor. Nor is it contested that Lloyd Electric was furnished electrical supplies and material for that job by Standard Lamp.

The defendants' argument is that the evidence is insufficient to prove the second element of the offense, i.e., that the defendants intentionally retained the funds entrusted to them. Their argument is that the state was obliged to prove beyond a reasonable doubt that the defendants retained the funds paid to them for the Douglas Dynamics project for purposes other than payment to Standard Lamp.

The state's position is that it was obliged to prove only that the defendants intentionally used the funds it received from Megal for purposes other than payment to Standard Lamp for the supplies Standard Lamp furnished for use on the Douglas Dynamics project.

Standard Lamp was entitled to receive $3,092.01 from the defendants for furnishing the electrical supplies the defendants used in the Douglas Dynamics project. The defendants argue that because they paid Standard Lamp $18,000 during the months of August and September, 1974, the funds received from Megal were used for their intended purpose, that is, payment to Standard Lamp. The state correctly argues, however, that Megal certainly did not intend that the defendants pay these funds to Standard Lamp for supplies which that company might have furnished on other construction projects. It is the state's position that had Lloyd Electric paid the funds it received from Megal to other electrical supply companies for items furnished on earlier projects, the de-

fendants would be in no position to argue that the funds had been expended for their intended purpose.

Under the statutes here in question, the state's position is the corrrect one. In the case of *Bastian v. LeRoy,* 20 Wis.2d 470, 483, 122 N.W.2d 386 (1963), we held that the trust fund created by sec. 289.02(4), Stats. (now renumbered 289.02(5), Stats.) arises "when the money has been paid by the owner or mortgagee to the contractor for improving the owner's property." We must look to the money paid by the owner to do the particular job and trace the use of those proceeds. Until all claims for labor and materials are paid, the contractor's interest in the money paid to him by the owner to the extent of the amount of all claims due and to become due for that project is merely as a trustee.

This view was expressed in a study of this provision in 1967 when the Legislature revised the construction lien laws. The study memorandum commented, "If a contractor is building several houses and uses a progress payment on the most recent one to pay off the subs on a previous one, that is larceny." Memorandum by Walter Raushenbush to the Insurance and Banking Committee of the Wisconsin Legislative Council on Possible Revision of Construction Lien Laws, Wisconsin Statutes, sec. 289.01– sec. 289.15, October 4, 1966.

In *Burmeister Woodwork Co. v. Friedel,* 65 Wis.2d 293, 222 N.W.2d 647 (1974), the plaintiff building material supplier sued the defendant who was in the business of building and selling homes. The defendant had received three loans to build three homes. The plaintiff had received only partial payment from the defendant on each of the three homes. Of the $135,137 received by the defendant in loans, only $107,364 was paid to subcontractors for work on the homes. Meanwhile, the defendant had paid out $33,564 in miscellaneous expenses including rent, interest payments, and other business expenses.

The defendant was held to have misappropriated the money received as loans, even though he used the money in good faith to pay the ordinary and normal operating expenses of the business.

The court stated that "the defendant . . . was responsible for the money received from the loans which were secured by mortgages. He used them to pay expenses incurred in the ordinary course of the corporation's business. He did not pay the plaintiff in full for labor and materials furnished in connection with the construction of the three homes. The money received from the loans was to be held in trust under sec. 289.02(5), Stats., and by using those funds for other purposes, the defendant became personally liable to the plaintiff for the amount still owed it. . . . [The defendant] could do only one thing with the trust funds and that was to pay the subcontractors. Only after that was done was he entitled to use the funds for corporate purposes. The fact that the corporation needed funds for other purposes did not change the limitation on the use of the trust funds. . . ." *Burmeister, supra* at 298, 300.

In *Burmeister*, it was held to be immaterial that the defendant had gained no personal benefit from the use of the money. The misappropriation of the funds came about because the supplier was not paid in full from the funds which had been borrowed for that purpose. As the court said, "sec. 289.02(5), is not concerned with the financial problems of corporations." *Id.* at 299. *Burmeister* was a civil case and in a civil action for conversion of trust funds, it is not necessary to show wrongful intent to defraud. *Id.* at 301.

This case, however, is a criminal case. Therefore, the state must prove intent to defraud beyond a reasonable doubt. But intent may be inferred from a defendant's conduct. As this court said in *State v. Kuenzli,* 208 Wis. 340, 346, 347, 242 N.W. 147 (1932):

". . . intent is a state of mind which can be evidenced only by words or conduct of the person who is claimed to have entertained it. The jury was under no obligation to accept the direct evidence of intent furnished by the defendant, and must be permitted to infer intent from such of the defendant's actions as objectively evidence his state of mind."

In *Kuenzli*, the defendant was a lawyer who had deposited funds belonging to his client in his own bank account. When the time came to transmit the funds to his client, the defendant discovered that he did not have sufficient funds to cover the amount. The defendant argued that the conversion of the funds was inadvertent, and he unsuccessfully tried to get a loan to make good the shortage. The court, in affirming the conviction, commented that "the deposit and subsequent use of the funds by the defendant for his own benefit may properly form a basis for an inference of felonious intent. If such an intent did exist at the time of those acts, even a contemporaneous intent to pay back the money at a later time would be of no legal consequence. It is our conclusion that there was a jury question, and that defendant's motions were properly denied." *Id.* at 347.

Similarly, in the instant case, the jury was entitled to infer that the defendants intentionally retained the money from the fact that Megal paid the defendants in full for the Douglas Dynamics project, but the defendants failed to pay Standard Lamp for supplies it furnished for that project.

When the defendant challenges the sufficiency of the evidence, the test is whether the evidence adduced, believed, and rationally considered by the jury was sufficient to prove the defendant's guilt beyond a reasonable doubt. *State v. Johnson*, 11 Wis.2d 130, 135, 104 N.W.2d 379 (1960). Conversely stated, the test is whether when con-

sidered most favorably to the state and the conviction, the evidence is so insufficient in probative value and force that it can be said as a matter of law that no trier of facts acting reasonably could be convinced to that degree of certitude which the law defines as "beyond a reasonable doubt." *Peters v. State*, 70 Wis.2d 22, 33, 233 N.W.2d 420 (1975). Furthermore, it is not necessary that this court be convinced of the defendant's guilt but only that the court is satisfied the jury acting reasonably could be so convinced. *State v. Shaw*, 58 Wis.2d 25, 29, 205 N.W.2d 132 (1973). *Taylor v. State*, 74 Wis.2d 255, 246 N.W.2d 516 (1976).

It is undisputed that Lloyd Electric was paid in full by Megal Construction for Lloyd's work on the Douglas Dynamics project. From the testimony elicited at the trial, the jury could conclude that the funds paid to the defendants were used for other purposes than paying Standard Lamp for the supplies it furnished on the Douglas Dynamics job. The $18,000 that the defendants paid to Standard during August and September of 1974 was applied to other obligations that Lloyd Electric had incurred for supplies furnished by Standard Lamp, and not to the Douglas Dynamics project. The defendants did not designate payment for this particular job. The jury was entitled to believe that the defendants knew they had a right to designate payment for a specific project, but that they allowed this money to be applied to other obligations that they owed to Standard Lamp. The jury could also conclude that the defendants knew that the money being paid from the Douglas Dynamics job was in fact being applied to its other obligations owed to Standard Lamp.

We conclude that there was sufficient evidence to prove the defendants' guilt beyond a reasonable doubt.

*By the Court.*—Judgments and orders affirmed.