SHELLEY, Plaintiff in error, v. STATE, Defendant in error.†

Court of Appeals

*No. 77–845–CR. Submitted on briefs November 8, 1978.—*
*Decided March 12, 1979.*
(Also reported in 278 N.W.2d 251.)

† Petition to review denied.

264

For the plaintiff-in-error the cause was submitted on the briefs of *Howard Eisenberg*, state public defender.

For the defendant-in-error, the cause was submitted on the briefs of *William L. Gansner*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

Before Decker, C.J., Cannon, P.J., and Robert W. Hansen, Reserve Judge.

HANSEN, J. The defendant, Kevin Shelley, was convicted of first degree murder, party to a crime, in violation of secs. 940.01 (1) and 939.05, Stats., and armed burglary, party to a crime, in violation of secs. 943.10 (1) (a)

and (2)(a), and 939.05, Stats., following a jury trial. The defendant was sentenced to life imprisonment on the murder conviction, and a concurrent term not to exceed twenty years on the armed burglary conviction.

The defendant and his codefendant, Joel Conerton, were charged with the murder of Robert Leitner, guard at the Milwaukee County Zoo, and with armed burglary of the zoo premises. The killing and the burglary took place in the early morning hours of June 1, 1976, at a time when there was about $74,000 in the safe in the zoo administration building.

The murder victim was seen by a fellow employee at the zoo at 12:30 a.m. on June 1st. This same employee found the victim at about 4:30 a.m. after the victim had been shot with a shotgun in his upper right chest and hip. The victim died as a result of hemorrhaging due to the shotgun wound to his chest. The victim's body showed bruising to the left side of his forehead and near his right eyebrow.

The telephone in the zoo administration office had been pulled from the wall. Two shotgun shells were found lying on the floor near the victim's body. A key fitting the lock on the zoo gate was found with five shotgun shells near the zoo. Also found near the zoo was an acetylene torch, which a welding supply dealer testified he had sold to codefendant Conerton. In addition to the acetylene tank, a sledge hammer and other items were found.

A parking lot attendant at the zoo since 1970, Thomas Brittain, testified that during 1975 and 1976 he had discussed with codefendant Conerton the robbing of the zoo, and that, in January of 1976, codefendant Conerton told Brittain that defendant Shelley would join in the robbery. Brittain and codefendant Conerton discussed the location and construction of the safe in the zoo administration building. Brittain further testified that he and codefendant Conerton, in the spring of 1976, went

to a welding store where Conerton purchased acetylene tanks.

In April of 1976, codefendant Conerton accompanied Brittain to the zoo where Brittain was to pick up his payroll check in the administration building. They left the building through a back door, passing through the general office area, the cashroom and the women's custodial room which is next to the room where the safe was located. Two weeks later, Conerton again accompanied Brittain to the zoo, at which time Conerton inspected the lock on the rear door of the administration building.

In May of 1976, codefendant Conerton told Brittain that he (Conerton) and defendant Shelley were going to the zoo at night to check on the guards to determine if there was any set route they traveled. Defendants Conerton and Shelley did go to the zoo twice at night, hiding in bushes and watching the administration building.

About one week before the murder and burglary, Conerton showed Brittain a semiautomatic shotgun, which Conerton had in his basement and which he had gotten from defendant Shelley. Conerton told Brittain that he and Shelley were going to take the shotgun with them to the zoo break-in.

On May 30, 1976, Brittain called Conerton at about 7 p.m. Conerton asked Brittain how much money Brittain had taken in at the parking lot at the zoo that day. He estimated parking lot receipts that day at $5,000 to $6,-000 and the maximum for zoo receipts that day at about $25,000. The next day, May 31st, at about 7 p.m., Brittain and Conerton talked again. Conerton asked if Brittain had seen a Brinks truck come in that day. Brittain answered that he had not. They again discussed zoo receipts for the day, estimating the zoo receipts on May 31st at another $25,000. Brittain asked Conerton if he and Shelley were going through with the break-in. Conerton responded that you could never tell until you did if you were actually going to do it.

On June 1st, 1976, at about 2:15 a.m., Brittain drove by the zoo. At the intersection of 97th Street and West Wisconsin Avenue, Brittain saw defendant Shelley and codefendant Conerton crossing the street. Conerton asked if anyone was with Brittain, to which Brittain answered no. Shelley and Conerton got into Brittain's auto; Shelley in the back seat, Conerton in the front passenger's seat. Before Conerton got in the car, he went across the street and returned with a shotgun with a sawed off barrel, which he held as he sat in the front seat of the car.

Brittain asked what happened. Codefendant Conerton said things had gone bad. Conerton then turned to defendant Shelley and said, "Kevin, you had better start thinking about what you are going to do if the police come to your home." The three then drove to the east side of Milwaukee, looking for a place where they could dump the shotgun in the Milwaukee River. When they got to a bridge on Capitol Drive, Brittain stopped the car and Conerton got out with the shotgun. That bridge was not over the river so Conerton got back in the car with the gun. Later they stopped in the parking lot near the Humane Society building. Conerton got out with the shotgun and returned without it.

Brittain testified that Shelley and Conerton appeared upset because they had to leave all their tools behind at the zoo. While they were driving around, the car was stopped so Shelley's jacket could be dropped into a sewer. Conerton took Shelley's shoes to put in a trash can, a trash pickup being scheduled for the next day. Brittain then dropped codefendant Conerton off about one block from his house and dropped defendant Shelley off at 76th Street and West Wisconsin Avenue. Conerton told Brittain to call him the next day to let him know what was happening at the zoo.

Thomas Brittain testified that he went to the police with the information on the burglary and murder at the zoo. On June 11, 1976, Brittain gave a statement to the

district attorney regarding his part in the incident. In exchange for Brittain's testimony in the prosecution of Shelley and Conerton, the district attorney agreed to charge Brittain only with one count of burglary for his part in the scheme to rob the safe at the zoo.

After being fully advised of his constitutional rights, defendant Shelley gave statements to Milwaukee police detectives, two oral statements and one written. In these statements Shelley said that he and codefendant Conerton went to the zoo at about 9:00 p.m.' on May 31st. They entered the grounds using a gate to which Conerton had a key, put the trunk with their tools in it in some bushes and then left. They returned some time later and tried to move the tools to the administration building, but, because the trunk was heavy, left it in the bushes, intending to go to the administration building, overpower the guard and then use his vehicle to bring the safecracking tools to the building.

They entered the police room of the zoo building by removing an outer window and reaching in to unlock the door. They waited in the men's room. Shelley held the sawed off shotgun. Conerton held a baseball bat. While they waited, shotgun shells containing rock salt were removed and live shells substituted.

When the zoo guard returned to the room, according to Shelley's statements, they came out of hiding. The guard began waving his keys about. Shelley told the guard to sit down. Shelley then shot the guard, stating the gun accidentally discharged. The guard did not fall to the ground so Conerton began hitting the guard in the head with the baseball bat. At this point, Shelley stated the shotgun again accidentally discharged. Shelley and Conerton then left the zoo grounds, meeting Brittain and riding with him to the east side to dispose of the shotgun and other evidence.

On the witness stand, defendant Shelley testified that he and Conerton first discussed robbing the zoo in late

April or early May of 1976. A week prior to the break-in, Shelley and Conerton discussed how to get into the zoo. On the night of May 30th, Shelley and Conerton went to the zoo and saw the guard making his rounds, leaving the administration building at about 1:00 a.m. Conerton had loaded a footlocker which Shelley helped Conerton carry from Conerton's basement and place in the trunk of Conerton's brother's car. In the trunk, Shelley saw a shotgun. Shelley testified he told Conerton he did not want to go through with the robbery. After they got to the zoo, they entered a gate, using Conerton's key, hid the footlocker in the bushes and drove back to Conerton's house. Shelley then drove back to his house.

About 45 minutes later, Conerton came to Shelley's house. Conerton asked if Shelley had something in which to put the stolen money. Shelley got a duffel bag and a mailbag. Shelley also brought along a can of colored hair spray. Shelley and Conerton then walked from Shelley's house to the zoo. Shelley and Conerton went to the zoo administration building where they waited outside because they heard voices. Two men left the administration building, the guard leaving about a minute after the zookeeper. Shelley and Conerton then went to the security room of the administration building where Shelley removed the screen from an open window, reached in and opened the door. Shelley and Conerton went in, Conerton immediately cutting the telephone wires. They hid in the men's room. While they waited, Conerton took the shotgun from Shelley, loaded it with live ammunition and gave it back to Shelley.

The guard, the victim in the killing, returned. Shelley came out of the men's room, shotgun in hand, and ordered the guard to hit the floor. The victim shook his keys and his flashlight around. Shelley testified that the guard came at him, waving the flashlight and hitting Shelley with it on the hands. Shelley, on direct examination, testified that the gun then went off. Shelley, on cross-examination, admitted that he pulled the trigger.

Conerton then hit the victim with the baseball bat and pushed the guard against the wall. Shelley testified that he almost dropped the shotgun, caught it in his left hand and pulled the trigger. After the second shot, Shelley and Conerton ran off. As did his earlier statements to police, Shelley's testimony as to what then transpired corroborated Thomas Brittain's testimony as to the three meeting and driving to the east side to dispose of the shotgun and other evidence.

There are six issues raised on this appeal: (1) Whether the evidence adduced at trial was sufficient to support the jury's finding the defendant guilty of first-degree murder; (2) Whether the evidence adduced at trial was sufficient to support the jury's finding the defendant guilty of armed burglary; (3) Whether the trial court properly refused defendant's motion for a protective order to permit his codefendant to testify at the defendant's trial with a grant of immunity as to use of such testimony against the codefendant at his trial; (4) Whether the trial court properly refused to compel the state to elect which provision of the party to a crime statute (sec. 939.05, Stats.) it was proceeding under and whether the jury instruction on party to a crime, explaining the alternative provisions as to guilt, violated defendant's right to a unanimous verdict; (5) Whether the trial court properly refused to instruct the jury on third-degree murder; and (6) Whether the trial court properly refused to instruct the jury on "diminished capacity." Each issue raised will be dealt with separately.

## I. SUFFICIENCY OF THE EVIDENCE —MURDER.

The defendant contends on this appeal that there was no direct evidence presented at trial which established

his intent to kill the zoo guard whom he did kill. We disagree. The objective evidence in this record as to what this defendant did, and the circumstances under which he did what he did, clearly permitted this jury to infer that he intended to kill when he twice shot the zoo guard. In a very recent case, the state supreme court has held that "intent may be inferred from a defendant's conduct." *State v. Blaisdell,* 85 Wis.2d 172, 179, 270 N.W.2d 69, 73 (1978). In that decision, the state high court held that a jury "must be permitted to infer intent from such of the defendant's acts as objectively evidence his state of mind." *Id.* at 180, 270 N.W.2d 74, quoting from *State v. Kuenzli,* 208 Wis. 340, 346–47, 242 N.W. 147 (1949). This jury could not read the mind, and was not required to accept the statement of this defendant as to what he did and why he did it. Intent can be inferred from conduct. The jury was permitted, as it did, to infer an intent to kill from what took place when the zoo guard was killed. Facts may be inferred by a jury from the objective evidence in a case. A trier of fact may infer from evidence of what transpired, and the attendant circumstances, the intentional nature of the acts committed. Thus a jury may reason from such objective evidence that the fact reasonably inferable has been established. *See Lofton v. State,* 83 Wis.2d 472, 490, 266 N.W. 2d 576, 584 (1978) (Abrahamson, J., concurring).

In this case, the subjective claim of the defendant that the shotgun was taken along to the robbery for "psychological reasons" sleeps uneasily alongside the objective evidence that, when the two would be safecrackers were in the men's room, they substituted live ammunition for the rock salt that was in the gun. Loaded with rock salt or no salt at all, a shotgun in the hands of a robber needs no live ammunition to make it fear-inspiring. As to the testimony of the defendant that the shotgun in his hands

twice discharged "accidentally", there is the objective evidence that the trigger twice was pulled, each time firing shotgun blasts, level and horizontal, into the person of the guard standing nearby. Under the circumstances here, the objective evidence as to what happened is sufficient to support the jury finding that the killing of the zoo guard by this defendant was accomplished with an "intent to kill." That jury finding is affirmed.

## II. SUFFICIENCY OF EVIDENCE —ARMED BURGLARY.

The defendant contends that the evidence at trial was insufficient to support the jury verdict of guilty of armed burglary, party to the crime. The claim is that the defendant intended to steal money from the safe which is in one room of the administration building, while he and his partner in crime actually broke into the police security room of the administration building. Over both rooms was a single roof, but, separating the two rooms, was a wall with no doorway in it, leading from the one room to the other. The trial court instructed the jury that the two rooms, the police security room and the room in which the safe was located, were merely different offices in a single building. We agree. It is true that, particularly in eastern cities, one encounters row houses, separate dwellings with a single common wall between them. But here we have a single structure: the zoo administration building. Both the room containing the safe and the room the defendants broke into were in that single building, literally both under the one roof. That a doorless wall separated them does not change the administration building into two buildings. Whether the two safe burglars intended to cut their way through that wall or overpower the guard and return with their acety-

lene torches to enter the room with the safe from the outside does not change the unauthorized nature of their entry into the administration building for the single purpose of burglarizing the safe located in such building. The evidence at trial was amply sufficient to uphold the jury verdict of guilty of armed burglary, party to the crime, by entry into the building without consent of the owner and with intent to steal or commit a felony therein.

## III. IMMUNITY FOR CODEFENDANT.

At trial the defendant sought an order from the trial court compelling codefendant Conerton to testify at the trial of defendant Shelley, such order to bar the state from any use of the Conerton testimony at any future judicial proceedings, including Conerton's pending trial on charges of first degree murder and armed burglary arising from the same killing of the same zoo guard as in the case before us. The motion and supporting affidavit stated that Conerton's testimony would be "corroborative" of defendant Shelley's testimony at trial. In view of Shelley's earlier statements and trial testimony concerning both burglary and killing, it is difficult to see how corroboration of his inculpatory statements would have added or changed anything in this case. However, the motion for compelled testimony with a protective order, would clearly open the door, in fact invite, a codefendant to take all blame in the trial of his partner in crime. Then, with such testimony barred at his own trial for his part in the same criminal enterprise, the exonerated partner could return the favor by shifting ground to assume all blame for the criminal incident. That result would be a disservice to the proper administration of criminal justice, but it is not with unfortunate results or appropriate public policy that we here deal.

We deal rather with the claim of a legal basis existing for defendant's claim of right to an order compelling testimony of his codefendant, with a conditional immunity granted as to such testimony. Defendant relies for this claim of right upon a decision of the state supreme court dealing with a probation revocation hearing. *State v. Evans,* 77 Wis.2d 225, 252 N.W.2d 664 (1977). But, in that case, recognizing the conditional nature of the liberty accorded a probationer, the court held only that "the testimony of a probationer or a parolee given in response to questions by a probation or parole agent or at a probation or parole revocation hearing, which questions are prompted by pending charges or accusations of particular criminal activity, or any evidence derived from such testimony, is inadmissible against the probationer or parolee during subsequent proceedings on related criminal charges except for purposes of impeachment or rebuttal where his testimony at the criminal proceeding is clearly inconsistent with the statements made previously." *Id.* at 235, 236, 252 N.W.2d at 668–69. This decision (and a subsequent one, *Neely v. State,* 86 Wis.2d 304, 272 N.W.2d 381 (Ct. App. 1979) dealt with the situation of a defendant's own statements being used against him in subsequent criminal proceedings. Neither the rationale nor the result reached in *Evans* can be stretched to cover the situation where, as here, a defendant seeks to secure immunity against future use for testimony to be given by someone other than himself, here a codefendant charged with the same crimes arising from the same incident in which the order seeking defendant is involved.

The statutory law in this state gives no support to the claim of right, asserted by this defendant, to have court ordered immunity for testimony to be given by a codefendant. Section 972.08(1), Stats., governs the granting

of immunity in Wisconsin. The compulsion of testimony of a witness by granting him immunity, the statute provides, may be ordered by the court only on motion of the district attorney. It has been made clear that a trial court may not *sua sponte* grant immunity, but may do so only on motion of the district attorney. *Hebel v. State,* 60 Wis.2d 325, 330, 210 N.W.2d 695, 698 (1973). *See also Peters v. State,* 70 Wis.2d 22, 38–41, 233 N.W.2d 420, 429–30 (1975); *Sanders v. State,* 69 Wis.2d 242, 261–62, 230 N.W.2d 845, 856 (1975). Not in the statute, and certainly not in the *Evans* decision, do we find support for defendant's contention that he was entitled to secure immunity for his codefendant for testimony to be given at this trial. The trial court's denial of such motion for such compelled testimony and protective order is affirmed.

## IV. PARTY TO A CRIME.

■
The defendant on appeal finds error in the trial court's having given the standard jury instruction defining "party to a crime" under sec. 939.05(2)(a), (b), and (c), Stats. The claim is that the jury instructions should have been in the disjunctive as to the three elements of "party to a crime" under the statute, the three being: (1) guilt as a principal; (2) guilt as an aider and abettor; and (3) guilt as a conspirator. In *Wray v. State,* 87 Wis.2d 367, 374, 275 N.W.2d 731, 734 (Ct. App. 1979), this court upheld the standard jury instruction as to party to a crime, holding: "Under the law of accomplice liability, sec. 939.05, Stats., it is immaterial to the offense whether its commission by Wray was direct or indirect. Common law accomplice liability has given way to statutory reform."

This interpretation of our state statute was found to be consistent with the reasoning and result reached by the federal court of appeals in *United States v. Gipson,* 553 F.2d 453 (5th Cir. 1977), and, we would add, confirmed by the post-*Gipson* holding in *United States v. Bolts,* 558 F.2d 316, 320, 321 (5th Cir. 1977). However, we note the recent decision of *Holland v. State,* 87 Wis.2d 567, 587–88, 275 N.W.2d 162, 172 (Ct. App. 1979), dealing with the matter of guilt as an aider and abettor or as a conspirator, holding that, in a prosecution for first degree murder "The criminal activity for direct commission is the act that causes the death plus the intent. The criminal activity that makes a person liable as an aider and abetter, however, is completely different. . . . The criminal activity that makes a person liable for the crime as a conspirator is also distinct. . . ." The apparent conflict between the rationales in *Wray* and *Holland* has no effect or impact on our decision here. Affirmance here does not need *Wray,* and is not affected by *Holland.*

In the case before us, the defense conceded and admitted that the victim of the crime was shot and killed by the act of this defendant who, at close range, twice fired shotgun blasts into the body of the victim. The sole issue raised was whether the shootings were intentional or unintentional and by accident. In his brief on appeal, defendant states: "Different and overlapping evidence was adduced which might have demonstrated one or the other of the alternatives under the Party-to-a-Crime Statute." That is simply not correct. There is in this case and record no question presented or issue involved as to guilt as an abettor or guilt as a conspirator. For the fatal shooting, the defendant accepts full and sole responsibility, and puts at issue only the matter of intent.

So the sole and single issue that went to this jury was as to intent, whether the admitted killing of the security guard by act of this defendant was intentional or unin-

tentional. The prosecution was under the party-to-a-crime statute, sec. 939.05, Stats., but involved solely subsection (2) (a), dealing with guilt as a principal. The reason for this prosecutorial choice of sec. 939.05, is clear. Given the killing of the guard by one of two armed burglars, each to be given separate trials, the party-to-a-crime charge covered the not unusual situation of each taking the stand to testify that not he, but the other, pulled the trigger in the fatal shooting. That did not here occur, the defendant admitting the trigger pulling or discharge of the shotgun by him, but testimony at time of trial cannot be predicted or foreseen by a prosecutor. In any event, any issue as to appropriateness of charging and proving guilt as a principal, where no issues as to abetting or conspiring arose, is not raised, either at time of trial or on appeal, by this defendant, and are not raised by us.

Asked by the trial court at the time of trial whether the defense theory was that the discharge of the shotgun by defendant was by accident, defense counsel responded: "Yes, or was unintentional. That's precisely—. . . . The discharges of the shotgun . . . were unintentional or by accident." Subsequently, defense counsel stated:

It's never been our contention that Mr. Shelley is not guilty—that the jury should return a verdict of not guilty in this case. Our only intent in trying this case is to try to raise a reasonable doubt as to whether the homicide in this case was an intentional one or unintentional one, not whether he should be found not guilty.

Subsequently, defense counsel stated, "Our position is the same, Kevin Shelley committed an unintentional homicide, which degree of any—of homicide it is for the jury to decide, but our defense is to the charge of first degree murder."

[9]

With the jury issue so solely and completely limited to the matter of intent, involving here only guilt as a prin-

cipal, it might be argued that any instructing of the jury as to aiding and abetting or conspiring to commit the crime were unnecessary, even inappropriate. Taking up this question would require us to review, not only the jury instructions as a whole, but the entire proceedings, before finding reversible error, for as the United States Supreme Court has held, "[a] judgment of conviction is commonly the culmination of a trial which includes the testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge." *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973). As to inadvertent inclusion of inapplicable jury instructions, a federal appeals court has held, "In the course of a well-tried case, replete with cogent evidence of guilt, this minor bobble affected no substantial right of the defendant." *United States v. Naylor*, 566 F.2d 942 (5th Cir. 1978). Even statements which, when taken out of context, appear prejudicial "[m]ay be innocuous when viewed in light of the entire trial." *U.S. v. McCoy*, 539 F.2d 1050, 1063 (5th Cir. 1976), citing *United States v. Musgrave*, 483 F.2d 327, 335 (5th Cir. 1975) *cert. denied*, 414 U.S. 1023 (1973). Even as to erroneous instructions, certainly as to unnecessarily added instructions, there is no reversible error unless it may reasonably be said that had the error not been made, the verdict might probably have been different. *Loveday v. State*, 74 Wis.2d 503, 518, 247 N.W.2d 116 (1976). That would certainly not be the case here. However, it is enough to hold that no issue was raised at time of trial, or on this appeal, as to any inappropriateness of the trial court instructing the jury as to guilt as an abettor or conspirator, where the issue involved only guilt as a principal. So we do not raise it now.

We conclude that the issue raised on this appeal as to the correctness of jury instructions involving guilt as an

abettor or guilt as a conspirator is not before us in a case where the sole issue raised by defendant and submitted to the jury was to guilt as a principal, whether the admitted killing was intentional or unintentional. Whether instructions should have been limited to the issue of intent as to guilt as a principal was not raised at time of trial, is not raised on this appeal and is not before us. It is also correct to hold, as we now do, that any issue as to instructions as given by the trial court as to first degree murder was here waived by this defendant and is not before us for review. Objections by defense counsel to the jury instructions as given by the trial court, repeated on this appeal, were made by defense counsel after the jury had been charged and had retired to deliberate. That was too late, and constitutes a waiver. A defendant cannot eat his cake and have it, too; delaying objections to instructions given until after a jury has been charged and it is too late for a trial court to alter or amend the instructions prepared and given. Such delay, as we have here, constitutes waiver.

In fact, the instant situation here goes beyond waiver. During the discussion with trial counsel, prosecutor and defendant's attorneys, concerning the defense theory that the defendant committed an unintentional homicide, the trial court stated,

I think then it's covered by the instruction on the first degree.

Defense counsel responded, I agree with that, Your Honor. The reason that the theory of defense instruction was submitted yesterday was because we had—we were hopeful that the Court would interpret the evidence as being consistent with submitting the third degree verdict, and in that case the jury instruction would be that, if you do not find him—if you do not find the State has proven intent beyond a reasonable doubt, then you are instructed you should consider the crimes of second,

third—second and third degree murder as well as verdicts of not guilty. Certainly the Court's limiting the consideration to first and second degree murder has caused us to retreat to the position where the jury instruction—standard jury instruction on first degree murder may well cover our theory.

That goes beyond waiver to consent on the part of this defendant to the standard jury instructions being given, as they were, by the trial court. The defendant cannot now find error in the instructions as given, when he agreed in advance that exactly such instructions should be given.

## V. INSTRUCTION—THIRD-DEGREE MURDER.

The defendant contends that the trial court erred in refusing to submit to the jury the lesser included offense of third-degree murder. Section 940.03, Stats., defines third-degree murder to be: "Whoever in the course of committing or attempting to commit a felony causes the death of another human being as a natural and probable consequence of the commission of or attempt to commit the felony . . . ." The trial court did not err in this regard. In a case where the sole issue was whether third-degree murder should have been submitted along with, as was done in the case before us, first-degree and second-degree murder, our state supreme court made clear that: "To justify submitting lesser degrees of homicide than that charged in the information, there must be a reasonable ground in the evidence for acquittal on the greater charge and for conviction on the lesser charge." *Harris v. State,* 68 Wis.2d 436, 439, 228 N.W.2d 645, 646 (1975). [Footnote omitted.] In *Harris,* the state high court held that a jury could not reasonably acquit the defendant of second-degree murder, so submission of

third-degree murder to the jury was not appropriate. The facts in *Harris* are close to those in the case before us. There, as here, defendant was armed with a loaded gun, but said he brought the gun "to scare." There, as here, he panicked when he pulled the trigger, and testified that he did not intend to shoot to kill. The supreme court responded, as we do here, that:

"At the most, all defendant's testimony shows, if believed by the jury as it evidently was not, is that he may not have had the specific intent to kill requisite to a first-degree murder conviction. However, second-degree murder has been defined as first-degree murder without the design to effect death, and we conclude that reasonably viewed the evidence reveals no basis for acquittal of second-degree murder here." *Id.* at 444, 228 N.W.2d at 649. [Footnote omitted.]

We find defendant's pointing the shotgun at the unarmed guard and his admitted squeezing of the trigger on the first shot as rendering his shooting the guard as voluntary as the allegedly panic-induced shooting in *Harris.* We do not see defendant's statement of the guard's hitting him with a flashlight as making the first shot, or the second, a struggle-caused involuntary act. Defense counsel on appeal argues that the theory of the defense was not that defendant's alleged lack of intent excused the act, "but only compelled a verdict of Third, and not First, Degree Murder." Instead, the trial court instructed the jury that, if it accepted the defense theory, it should find the defendant not guilty of any degree murder. The trial court was correct. Those were the alternatives: first-degree murder, second-degree murder or acquittal. There was no reason and, under *Harris,* no right to submit third-degree murder as an additional option for the jury to consider.

## VI. INSTRUCTION—DIMINISHED CAPACITY.

Consideration of the defendant's challenge to the trial court's refusal to give requested instructions as to "diminished capacity" of defendant to form a criminal intent must begin with taking note of defendant's motion *in limine* seeking an order permitting him to introduce expert testimony as to defendant lacking a specific intent to kill at the time of his shooting the zoo guard. That motion was made on January 10, 1977. Subsequently, on February 10, 1977, the defendant requested the trial court to defer any decision on such motion until the time of trial. At the time of trial, defense counsel informed the court that he no longer intended to introduce expert testimony that the defendant lacked a specific intent to kill at the time of the offense. At that time defense counsel informed the court that it intended to produce expert testimony to testify as to tests they performed on defendant, such experts to testify only as to "the character traits of non-hostility and non-aggressiveness of the defendant." Stating that such expert testimony would not be offered to establish an inability of defendant to form the requisite intent to kill, defense counsel stated that the defense intended to "follow precisely the strictures of King."

The reference is to *King v. State*, 75 Wis.2d 26, 248 N.W.2d 458 (1977). Earlier cases of the state supreme court had held that psychiatric testimony as to an inability to form criminal intent was not admissible in criminal cases. *See Hughes v. State*, 68 Wis.2d 159, 227 N.W.2d 911 (1975) ; *Muench v. State*, 60 Wis.2d 386, 210 N.W.2d 716 (1973). However, in *King*, the supreme court held, in a first-degree murder case, that the defendant "was entitled to place into evidence not only opinion testimony but expert opinion testimony concerning his general character trait of nonhostility and non-aggressiveness." *King, supra* at 39. Subsequently, and

subsequent to the trial of this case, restrictions on admission of expert opinion testimony on capacity to form intent were withdrawn in *Schimmel v. State,* 84 Wis.2d 287, 302, 267 N.W.2d 271 (1978).

Thus, it is clear from the record that the trial court did not preclude the defense in this case from presenting expert opinion testimony as to any claimed diminished capacity to form intent. Rather, the defense limited its proof and offer of proof to the testimony concerning character traits, as permitted by the *King* decision, then the law of the state. As defense counsel stated at time of trial, "We are not calling these people for that purpose [of negativing capacity to form intent]. We know the trial court has run a very efficient trial thus far and we know it will not allow collateral improper issues in. We are not worried about it." No issue was raised at the time of trial as to other expert opinion testimony being offered except as to character traits, as permitted by *King,* and expert opinion testimony as to character traits was offered. With no issue raised at time of trial, and with the defense permitted to offer expert opinion testimony as to character traits, we have no issue as to such testimony being now before us for review. We decline to consider issues raised for the first time on appeal.

However, with no issue raised as to admissibility of expert opinion testimony as to capacity to form intent at the time of trial, the record gives no basis or ground for faulting the trial court for failing to give requested instructions as to diminished capacity. In instructing the jury on the intent element of first-degree murder, the trial court did instruct the jury that character traits of the defendant could be considered by the jury in its determination of the defendant's state of mind. The testimony of psychiatric experts as to character traits of the defendant warranted the trial court's instruction.

However, the defense requested instructions on diminished capacity that would have instructed the jury that: (1) if the evidence at trial showed that the defendant was, at the time of the offense charged, incapable of forming an intent to kill or that the defendant had substantially reduced mental capacity to do so, because of mental disease, defect, or abnormality, then the jury must determine whether this incapacity negatived the specific intent required for first-degree murder; and (2) that the jury must also determine whether the defendant had the capacity to form the mental state necessary for second-degree murder.

The trial court did not err in refusing such requested instructions as to diminished capacity to form intent. In the record of trial proceedings there is no evidence as to any lack of capacity of this defendant to form an intent to kill, or of a diminished capacity to form such intent. There is psychiatric testimony concerning personality traits, such as non-hostility and non-aggressiveness, but such testimony, limited as it was to character or personality traits of the defendant, is not a basis for seeking and securing instructions on lack of capacity or diminished capacity to form intent. The defendant is not entitled to an instruction unless it is reasonably required by the evidence at trial. *Loveday v. State,* 74 Wis.2d 503 522, 247 N.W.2d 116 (1964). The trial court instructed the jury as required by what was in the record. It was not required to instruct the jury as to what was not in the record.

On the six issues raised by defendant on this appeal, we find no error in trial court proceedings and no reason for setting aside either the jury verdict or the trial court judgment.

*By the Court.*—Judgments and order affirmed.