In re Michael Joseph LOTTO a/k/a Mike J. Lotto, a/k/a Mike Lotto, d/b/a Lotto Homes Diane Mary Lotto a/k/a Diane Lotto, Debtors.

Randy M. VINE and Michelle J. Vine, Plaintiffs,

v.

Michael Joseph LOTTO a/k/a Mike J. Lotto, a/k/a Mike Lotto d/b/a Lotto Homes Diane Mary Lotto a/k/a Diane Lotto, Defendants.

Bankruptcy No. 81–01703.

Adv. No. 81–0944.

United States Bankruptcy Court, E. D. Wis.

June 28, 1982.

James R. Sickel, Bittner, Hinkfuss & Sickel, Green Bay, Wis., for plaintiffs.

Thomas W. Roznowski, Condon, Hanaway, Wickert & Fenwick, Ltd., Green Bay, Wis., for defendant.

## DECISION

D. E. IHLENFELDT, Bankruptcy Judge.

Plaintiffs have asked the court to declare their claim against the debtor in the amount of $8000 to be nondischargeable, pursuant to § 523(a)(4) of the Bankruptcy Code.[1] Trial was held on December 3, 1981,[2] and extensive briefs have been filed by the parties. The issue involves an interpretation of Wis.Stats. s. 779.02(5), the Wisconsin "Theft by Contractor" statute, and the facts are substantially not in dispute.

In late August, 1980, in response to a newspaper ad, Randy Vine visited a model home where he met the debtor, Michael Lotto. Lotto operated a sole proprietorship home construction business known as Lotto Homes. Lotto built some homes on speculation ("spec"), that is, he himself financed the construction with the expectation of selling them at a profit, while other homes were built pursuant to contract with the purchaser providing the financing.

Vine was interested in a passive solar home, and discussed with Lotto what

---

1. Section 523(a)(4) of the Code provides:

"A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity...."

2. At the outset of the trial, on stipulation of the parties, the action was dismissed as to the defendant, Diane Lotto.

changes might be needed in the plans to adapt it to a lot which the Vines owned. On September 3, 1980, Vine, together with Mrs. Vine, met with Lotto and looked over a pencil sketch illustrating the appearance of the finished home (Ex. 9), a detailed drawing of the floor plan and basement plan (Ex. 10) and a contract (Ex. 1) which Lotto had prepared in the .interim. The parties went through the terms of the proposed contract together, and discussed the question of how the home was to be financed and what downpayment should be made. Thereafter, on September 8, 1980, Vine and Lotto again met, signed the contract, and Vine turned over a check for $8000 to Lotto as a downpayment on the home. In return for the check, Vine was given a receipt (Ex. 3) reading as follows:

### LOTTO HOMES

Sept. 8, 1980

Received from Randy Vine $8,000 as downpayment for construction of his new home in accordance with signed contract between him and Lotto Homes. 50.00 is shown in contract for purposes of obtaining State V.A., but actually 8,000 is put down now. In the event V.A. financing cannot be obtained, this money of $8,000.00 is to be returned to Randy Vine.

Received Sept. 8, 1980
/s/ Michael J. Lotto

Having financed a previous home with a veterans loan, the Vines were hopeful, albeit dubious, of the possibility of securing similar financing for the Lotto home, since a conventional mortgage would cost considerably more. With encouragement from Lotto, however, they applied for such a loan, while Lotto proceeded to order blueprints, prepare a detailed list of the lumber and materials needed for construction, and the like.

The contract provided that Vine should obtain his financing in time for work to begin by October 3, 1980, with the home to be completed by December 31, 1980. Prior to October 3rd, Vine told Lotto that he couldn't get the "V.A." loan. Following further discussions between the parties, Vine indicated he would try to obtain other financing, and Lotto agreed to hold firm on the contract price of $51,962. Despite the language in Exhibit 3, no discussion was had regarding the return of the $8000 downpayment.

Through November, 1980, with some assistance from Lotto, the Vines continued their efforts to secure financing but were unsuccessful.[3] Around the beginning of December, the Vines heard from Mrs. Vine's uncle, who was also in the real estate business, that Lotto was in financial difficulties. On December 7, 1980, they met with Lotto and asked for their money back. He told them he didn't have it, that he had put it into his business, but that he was closing a deal in January and would return it to them at that time. They mentioned the rumors they had heard, and Lotto stated there were a lot of rumors and that they were false. When January came, however, the deal which Lotto had been counting on fell through, and the Vines did not receive the money.

Meanwhile, in December and later in January and February, 1981, in an effort to salvage their situation, the Vines discussed with Lotto alternatives to the initial contract, for example, that Lotto would construct the basic shell, and Vine would put on the finishing touches. None of these worked out. In March, 1981, the Vines' application for a conventional mortgage was approved, provided they had the $8,000, but Lotto could not come up with the money. On June 5, 1981, Lotto filed this chapter 7 case.

A few days after the trial, in a letter to the parties regarding briefing, the court wrote in part as follows:

In the Lotto case, as I stated at the close of the trial and as I believe the plaintiff conceded, the evidence does not

---

3. In order to save money, the Vines were directing their efforts toward other than conventional financing. For one reason or another, their applications failed to gain approval of the prospective lenders.

show that Lotto took the plaintiffs' money not intending to build their house. In fact, the evidence is I believe clear and convincing to the contrary, that he intended to build their house and did everything he could in that direction while efforts were being made to obtain financing. I believe further that the brief conversation when the money was turned over regarding Lotto's financial status would not constitute a fraudulent misrepresentation which would justify holding the debt to be nondischargeable. The issue then goes to the relationship of the parties and the question of Lotto's duty to disclose what he intended to do with the plaintiffs' money. That is the issue that I will have to decide and toward which your briefs should be directed.

The above statement fairly states the legal issue to be decided in this case. In August and September, 1980 when the Vines met with Lotto and turned over the $8000 to him, he was not in good shape financially, but then his situation was no different than it had been for a number of years. He had completed a contract home around the end of June and was in the process of building two "spec" homes. When the Vines turned over the $8000 to him on September 8, 1980, he deposited it in his regular business account[4] and issued checks against it to pay business debts and expenses, including a considerable amount to pay expenses incurred in the building of the "spec" homes. His bank statements for that period show the following totals:

| | Deposits | Total of Checks Written | Beginning Balance | Ending Balance |
|---|---|---|---|---|
| August | 21,047.26 | 21,788.50 | 3,648.36 | 2,907.12 |
| September | 51,881.26 | 54,278.13 | 2,907.12 | 510.25 |
| October | 41,567.50 | 42,895.31 | 510.25 | 817.56 |
| November | 33,400.00 | 27,375.95 | 817.56 | 5,206.49 |
| December | 22,000.00 | 17,357.51 | 5,206.49 | 9,848.98* |

*The large closing balance resulted from a $10,000 deposit made on 12/31/80.

In September, 1980 when the Vines paid over the $8000 to Lotto, the parties discussed the terms of the contract and the type of house to be built, but there was little discussion concerning the downpayment, and none concerning what Lotto would do with the money. Regarding Lotto's finances, the record shows only a brief question in that respect by the Vines in the meeting on September 3, 1980, and Lotto's response to the effect that if he was going to go under, he would have gone under before that time.

Mrs. Vine noted that her father was a realtor and Lotto was a realtor and it was the Vines' understanding that Lotto would put the money in a trust account, and if they didn't get the "V.A." financing, it

would be returned. Lotto was a licensed real estate broker, but in his dealings with the Vines, he never acted in any capacity other than as a building contractor. Lotto said it was his practice and further, correctly the court believes, the practice among building contractors generally, to deposit such funds in their regular business checking account—that the relationship of the parties is a simple debtor-creditor relationship. The Vines never asked if the money would be deposited in a trust account, and Lotto never told them that it would be deposited in his regular business checking account.

Relying on Wis.Stats. s. 779.02(5),[5] it is the position of the Vines that Lotto was a

4. Lotto also maintained a personal checking account. In addition, he was a real estate broker and maintained accounts for his activities as a broker, including a trust account for moneys held in trust.

5. 779.02(5) "THEFT BY CONTRACTORS.

fiduciary with respect to them and accordingly he was guilty of defalcation, or alternatively, that as a fiduciary he had the duty to disclose that he was putting the money into his business rather than into a trust account.

■ Section 523(a)(4) is limited in its application to what may be described as technical or express trusts, and not to trusts that may be imposed because of the very act of wrongdoing out of which the contested debt arose. 3 *Collier on Bankruptcy* 523–99 (15th ed.). Section 779.02(5) provides that funds received by general contractors for the improvement of real property must be held in trust for the benefit of subcontractors and suppliers.

Bankruptcy courts in Wisconsin have followed the case of *Bastian v. Leroy*, 20 Wis.2d 470, 122 N.W.2d 386 (1963)[6] in holding that the Wisconsin statute creates the type of trust contemplated by § 523(a)(4) of the Code and its predecessor, § 17a(4) of the Bankruptcy Act of 1898, so as to render nondischargeable the unpaid claims of subcontractors and suppliers. *In re Frasier,*

No. 72–BK–74 (W.D.Wis., August 7, 1972); *In re Mack*, No. 72–B–1303 (E.D.Wis., March 29, 1974); *In re Schultz*, No. 74–1469 (E.D.Wis., March 24, 1975); *In re Wolter*, No. 77–B–501 (E.D.Wis., August 23, 1979). These decisions find support in the recent case of *Carey Lumber Co. v. Bell* (5th Cir. 1980), 615 F.2d 370, in which the court held that the Oklahoma Construction Trust Fund statute, which is comparable to that in Wisconsin, creates an express trust within the meaning of § 523(a)(4) of the Code. See also, *In re Kawczynski*, 442 F.Supp. 413 (W.D.N.Y., 1977).

■ While the cases cited above indicate that the Wisconsin statute creates the type of fiduciary relationship contemplated by § 523(a)(4) of the Code, the case at bar presents an important factual distinction. Whereas all of the foregoing cases involved claims of unpaid subcontractors and materialmen or of others who were subrogated to such claims, in this case the only work or material furnished has either been paid for by Lotto, or was supplied by Lotto himself. Thus, there are no unpaid subcontractors or materialmen, and there will be none.

The proceeds of any mortgage on land paid to any prime contractor or any subcontractor for improvements upon the mortgaged premises, and all moneys paid to any prime contractor or subcontractor by any owner for improvements, constitute a trust fund only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor and materials used for the improvements, until all the claims have been paid, and shall not be a trust fund in the hands of any other person. The use of any such moneys by any prime contractor or subcontractor for any other purpose until all claims, except those which are the subject of a bona fide dispute and then only to the extent of the amount actually in dispute, have been paid in full or proportionally in cases of a deficiency, is theft by the prime contractor or subcontractor of moneys so misappropriated and is punishable under s. 943.20. If the prime contractor or subcontractor is a corporation, such misappropriation also shall be deemed theft by any officers, directors or agents of the corporation responsible for the misappropriation. Any of such misappropriated moneys which have been received as salary, dividend, loan repayment, capital distribution or otherwise by any shareholder of the corporation not responsible for the misappropriation shall be a civil liability of the shareholder and may be recovered and re-

stored to the trust fund specified in this subsection by action brought by any interested party for that purpose. Except as provided in this subsection, this section does not create a civil cause of action against any other person. Until all claims are paid in full, have matured by notice and filing or have expired, such proceeds and moneys shall not be subject to garnishment, execution, levy or attachment."

s. 779.02(5) has been construed to apply to the owner himself where he receives the proceeds of a mortgage and is acting as the general contractor. *Paulsen Lumber, Inc. v. Meyer*, 47 Wis.2d 621, 177 N.W.2d 884 (1969).

In addition to the foregoing, Wis.Stats. s. 943.20 creates a criminal action for theft by contractor. Whether or not Lotto is susceptible to prosecution under that statute is not before this court, and the court has no comment in that respect.

**6.** With a few exceptions, until 1970 when an amendment to the Bankruptcy Act gave the bankruptcy courts general jurisdiction to determine such questions, the dischargeability of particular debts was decided in suits in state courts. The *Bastian* case dealt with Wis.Stats. s. 289.02(4) and s. 17a(4) of the Bankruptcy Act of 1898, predecessors to the statutes here involved.

The law in Wisconsin regarding trusts is set forth in *In re Kessler's Estate*, 271 Wis. 512–514, 74 N.W.2d 146 (1956):

To be valid, a trust requires that a beneficiary be named or designated.... It is not necessary that the beneficiary exist or be ascertainable at the time the trust is created but he must be ascertainable within the time limited by the rule against perpetuities.

The Wisconsin statute, s. 779.02(5) indicates that the moneys paid to a contractor or subcontractor constitute a trust fund "to the amount of all claims due or to become due or owing ... for labor and materials used for the improvements, until all the claims have been paid...."[7] It is significant that the statute states specifically that funds so held are not subject to garnishment, execution or attachment "until all claims are paid in full, have matured by notice and filing or have expired." In approving the garnishment of such funds in the case of *Danischefsky v. Klein-Watson Co.*, 209 Wis. 210 at 215, 244 N.W. 772 (1932),[8] the court said:

It is equally apparent that a trust cannot be created without a beneficiary. It nowhere appears that there are any unpaid claims due to workmen or materialmen on account of work done or materials furnished to the contractor. Therefore, no trust can or does arise....

The legislative history of the statute, as detailed in the case of *Weather-Tite Co. v. Lepper*, 25 Wis.2d 70, 72, 130 N.W.2d 198 (1964) supports the proposition that it is the laborers, materialmen and subcontractors who are the beneficiaries of the trust. The court said:

The statutory trust fund of moneys paid by an owner to the contractor was originally established for the payment of "claims due for labor and materials to persons entitled to a lien by law against said owner or his property, ..."[1] This language was interpreted in *Pauly v. Keebler*[2] as excluding all persons who had been entitled to a lien but had lost that right by failing to take the necessary steps to perfect a lien. The statute was amended in 1935 so as to cover claims due or to become due "for lienable labor and materials."[3] In 1955 the legislature amended the statute by dropping the word "lienable" and provided for a trust in the amount of all claims due or to become due "for labor and materials used for such improvements..."[4]

---

1. Ch. 213, sec. 3, Laws of 1913

2. (1921), 175 Wis. 428, 185 N.W. 554

3. Ch. 483, sec. 87, Laws 1935

4. Ch. 78, Laws of 1955

In the case at bar, there are no laborers, subcontractors or materialmen in existence who could assert claims, and there never can be. No beneficiaries of the trust created in s. 779.02(5) are in existence or can ever come into existence, and therefore, the statute has no application.

This decision shall stand as and for findings of fact and conclusions of law pursuant to Bankruptcy Rule 752.

---

7. "Until all claims for labor and materials are paid, the contractor's interest in the money paid to him by the owner to the extent of the amount of all claims due and to become due for that project is merely as a trustee." *State v. Blaisdell*, 85 Wis.2d 172, 178, 270 N.W.2d 69 (1978).

8. The *Danischefsky* case involved what is now Wis.Stats. s. 779.16, a section that deals with funds paid to a contractor or subcontractor for public improvements on a project which is pending or is to be commenced, but its language is virtually the same as that in s. 779.-02(5).