STATE of Wisconsin, Plaintiff-Respondent,

v.

Richard STEPNIEWSKI and Edward Malec, Defendants-Co-Appellants-Petitioners.

Supreme Court

*No. 80–750–CR. Argued November 4, 1981.*
*—Decided January 5, 1982.*

(Also reported in 314 N.W.2d 98.)

For the appellants-petitioners there was a brief (in court of appeals, reply brief in this court) by *Richard E. Reilly* and *Gimbel, Gimbel & Reilly* of Milwaukee and oral argument by *Richard E. Reilly*.

For the plaintiff-respondent the cause was argued by *David J. Becker,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

STEINMETZ, J.   The principal issue in this case is whether the state must prove intentional conduct by a defendant in all charged circumstances of a violation of

sec. 100.26(3), Stats. 1977,[1] for a conviction. This issue involves a statutory construction and constitutional requirements of due process. The trial court, the Honorable Ted E. Wedemeyer, Jr., in a trial to the court held that intent is not a requisite to be shown for all charged circumstances and that due process was not violated. The court of appeals agreed, and we affirm.

The defendant, Edward Malec, also challenges the sufficiency of the evidence for his conviction for violating secs. 289.02(5) and 943.20(1)(b), Stats. 1977.[2]

---

[1] Sec. 100.26(3), Stats. 1977, provides:

"Any person who violates s. 100.15, 100.19, 100.20 or 100.22, or who intentionally refuses, neglects or fails to obey any regulation made under s. 100.19 or 100.20, shall, for each offense, be fined not less than $25 nor more than $5,000, or imprisoned in the county jail for not more than one year or both."

[2] Sec. 289.02(5), Stats. 1977, provides:

"(5) THEFT BY CONTRACTORS. The proceeds of any mortgage on land paid to any prime contractor or any subcontractor for improvements upon the mortgaged premises, and all moneys paid to any prime contractor or subcontractor by any owner for improvements, constitute a trust fund only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor and materials used for the improvements, until all the claims have been paid, and shall not be a trust fund in the hands of any other person. The use of any such moneys by any prime contractor or subcontractor for any other purpose until all claims, except those which are the subject of a bona fide dispute and then only to the extent of the amount actually in dispute, have been paid in full or pro rata in cases of a deficiency, is theft by the prime contractor or subcontractor of moneys so misappropriated and is punishable under s. 943.20. If the prime contractor or subcontractor is a corporation, such misappropriation also shall be deemed theft by any officers, directors or agents of the corporation responsible for the misappropriation. Any of such misappropriated moneys which have been received as salary, dividend, loan repayment, capital distribution or otherwise by any shareholder of the corporation not responsible for the misappropriation shall be a civil liability of the shareholder and may be recovered and restored to the trust fund specified in this subsection by action brought by any interested

The test on appeal for sufficiency of evidence to support a conviction is whether the evidence adduced, believed and rationally considered by the trier of fact was sufficient to prove the defendants' guilt beyond a reasonable doubt. *State v. Blaisdell,* 85 Wis. 2d 172, 180, 270 N.W.2d 69 (1978).

In 1978 and 1979, the defendants, Edward Malec and Richard Stepniewski, were engaged in home improvement sales solicitations in Milwaukee county through a firm named Energy Control Systems, Inc. Mr. Malec was the president and principal stockholder in the company, while Mr. Stepniewski was a salesman-employee of the firm. Mr. Malec kept the company's books, had the power of final approval for all the company's contracts, coordinated work on its projects and often worked personally on homes. Mr. Stepniewski solicited contracts for the company, which included drafting contracts on behalf of the firm, and handled complaints and questions pressed by its customers.

---

party for that purpose. Except as provided in this subsection, this section does not create a civil cause of action against any other person. Until all claims are paid in full, have matured by notice and filing or have expired, such proceeds and moneys shall not be subject to garnishment, execution, levy or attachment."

Sec. 943.20 (1) (b), Stats. 1977, provides:

"By virtue of his office, business or employment, or as trustee or bailee, having possession or custody of money or of a negotiable security, instrument, paper or other negotiable writing of another, intentionally uses, transfers, conceals, or retains possession of such money, security, instrument, paper or writing without the owner's consent, contrary to his authority, and with intent to convert to his own use or to the use of any other person except the owner. A refusal to deliver any money or a negotiable security, instrument, paper or other negotiable writing, which is in his possession or custody by virtue of his office, business or employment, or as trustee or bailee, upon demand of the person entitled to receive it, or as required by law, is prima facie evidence of an intent to convert to his own use within the meaning of this paragraph."

Evidence produced at the trial showed that Mrs. Stella Richlen and her daughter, Terri, contracted for home improvement work with Energy Control Systems, Inc., through Stepniewski. The Richlens paid a down payment of $4,000 for the work and this money was transferred to Malec for deposit in the Energy Control Systems, Inc., account. No work was ever done under this contract. Mr. Malec told the Richlens that he had given some of their money to the Boy Scouts as a contribution, but didn't know how much of it was theirs. He also admitted at trial that he gave some of the Richlens' money to the Boy Scouts. This usage of those funds was not a term of the contract, nor was it approved by the Richlens. In addition, the trial court held the defendants' cash receipts journal clearly reflected the use of Richlens' money in Malec's gift to the Boy Scouts. The above admission of Malec was sufficient for conviction.

As this court stated in *State v. Blaisdell, supra,* at 178:

"Under the statutes here in question, the state's position is the correct one. In the case of *Bastian v. LeRoy,* 20 Wis. 2d 470, 483, 122 N.W.2d 386 (1963), we held that the trust fund created by sec. 289.02(4), Stats. (now renumbered 289.02(5), Stats.) arises 'when the money has been paid by the owner or mortgagee to the contractor for improving the owner's property.' We must look to the money paid by the owner to do the particular job and trace the use of those proceeds. Until all claims for labor and materials are paid, the contractor's interest in the money paid to him by the owner to the extent of the amount of all claims due and to become due for that project is merely as a trustee."

Once the contractor (Malec) used the money of another (Richlen), given him for a particular building project, for another purpose or project before all the claims due or to become due were paid for the project that generated the payment, he violated the trust and

committed a theft. The evidence in this case demonstrated Malec violated the trust and the trial court's finding of his guilt of theft as a contractor is sustained.

The defendants, Malec and Stepniewski, were each convicted of trade practice violations, Malec of six violations and Stepniewski of 12 counts. The evidence showed that the two defendants violated ch. AG 110 Wis. Adm. Code,[3] promulgated under sec. 100.20 (2), Stats.[4] In particular, the defendants on several occasions failed to state in writing projects' starting and completion

---

[3] Ch. AG 110 Wis. Adm. Code, in pertinent part, states:

"AG 110.02 **Prohibited trade practices.** No seller shall engage in the following unfair methods of competition or unfair trade practices:

". . .

"(7) PERFORMANCE. . . .

"(b) Fail to begin or complete work on the dates or within the time period specified in the home improvement contract, or as otherwise represented, unless the delay is for reason of labor stoppage, unavailability of supplies or materials, unavoidable casualties, or any other cause beyond the seller's control. Any changes in the dates or time periods stated in a written contract shall be agreed to in writing."

"AG 110.05 **Home improvement contract requirements.** . . .

". . .

"(2) Home improvement contracts and all changes in the terms and conditions thereof, required under this section to be in writing, shall be signed by all parties thereto, and shall clearly and accurately set forth in legible form all terms and conditions of the contract, and particularly the following:

". . .

"(d) The dates or time period on or within which the work is to begin and be completed by the seller."

[4] Sec. 100.20 (2), Stats., provides:

"The department, after public hearing, may issue general orders forbidding methods of competition in business or trade practices in business which are determined by the department to be unfair. The department, after public hearing, may issue general orders prescribing methods of competition in business or trade practices in business which are determined by the department to be fair."

dates. On other occasions, while the defendants did enter such dates in writing, they then failed to complete the projects. In two cases where work was left undone, severe damage occurred to the homes when winter arrived. Many of the homeowners victimized by the defendants were elderly and retired citizens.

The trial court sentenced Stepniewski to one and one-half years imprisonment and six consecutive years of probation. At the time of sentencing, he was on probation for an earlier conviction under the theft by contractor statute.

The court sentenced Malec to 13 months incarceration for theft by contractor, plus six consecutive years in prison. The latter sentences for home improvement violations were stayed, and Malec was placed on probation for six years.

In addition, as terms of probation, the defendants were held jointly and severally liable for full restitution.

The defendants did not raise the issue of statutory construction in the court of appeals; however, the issue is raised here.

The defendants interpret the focused language of sec. 100.26(3), Stats. 1977, "or who intentionally refuses, neglects or fails to obey any regulation made under s. 100.19 or 100.20, shall, . . ." as meaning that "intentionally" modifies all the words following it.

In *State v. Balestrieri*, 87 Wis. 2d 1, 7, 274 N.W.2d 269 (Ct. App. 1978), that court held: "We therefore hold that the term 'intentional' in sec. 100.26(3), Stats., only modifies the term 'refuses.' It does not modify the terms 'neglect' or 'fails.'" This court affirmed the decision of the court of appeals in *Balestrieri* by an evenly divided court. *State v. Balestrieri*, 96 Wis. 2d 361, 362, 291 N.W. 2d 579 (1980). The issue is again before this court.

The statute is "capable of being understood by reasonably well-informed persons in two or more different senses" and consequently is ambiguous. *Wirth v. Ehly,* 93 Wis. 2d 433, 441, 287 N.W.2d 140 (1980) ; *accord, State ex rel. Warrington v. Shawano Cty. Cir. Ct.,* 100 Wis. 2d 726, 303 N.W.2d 590, n. 1 (1981). When ambiguity exists, "this court may resort to extrinsic aids in determining legislative intent." *Wirth v. Ehly, supra,* at 441–42; *accord, Milwaukee County v. Proegler,* 95 Wis. 2d 614, 625, 291 N.W.2d 608 (Ct. App. 1980).

The words following "intentionally" are *"refuses," "neglects"* or *"fails."* (Emphasis added.) The Random House Dictionary of the English Language, Unabridged Edition, relevant definitions of those words as verbs are:

"refuse— . . . to express a determination not to (do something) . . . to decline to submit to . . . to decline acceptance, consent, or compliance . . ."

"neglect—to pay no attention . . . to omit, through indifference or carelessness . . . to fail to carry out or perform (order, duties, etc.) . . ."

"fail—to fall short of success or achievement in something expected, attempted, desired, or approved . . . to be or become deficient or lacking . . ."

Since "refuses" has usages ranging from an expression of determination to not do something to a more passive declination of compliance, it is apparent the legislature preceded the word "refuses" with "intentionally" to make it understood that the refusal intended was the determination to not do something. This was done so mere declination to comply would be understood to be the same as a failure to carry out or perform an order or duties, which is the meaning of *neglect.* Neglect was, therefore, not modified by "intentionally," since the conduct described was something less than determination to not act.

The word "fails" was intended to mean a failure to obey a regulation by a lack of success or achievement, where the performance in compliance was deficient or lacking.

The legislature intended to provide for as wide a range of conduct to be included as an offense of sec. 100.26(3), Stats. 1977, as penalties provided: "shall for each offense, be fined not less than $25 nor more than $5,000, or imprisoned in the county jail for not more than one year or both."

The legislature has shown its awareness of the use of intentional in respect to neglect and other words in other statutes, *i.e.:*

"52.05 **Abandonment; uniform act. (1)** PENALTY. Any person who, without just cause, deserts or wilfully [intentionally] neglects *or* refuses to provide for the support and maintenance of his or her spouse or child under 18 years . . . ." (Emphasis added.)

"947.15 **Contributing to the delinquency of children; neglect; neglect contributing to death.** (1) The following persons . . .

"(a) Any person . . . who intentionally encourages *or* contributes to the delinquency . . . *or* the neglect of any child. . . ." (Emphasis added.)

When the legislature intended in those statutes that the modifying word "intentionally" apply to other words and also "neglect," it used the conjunctive word "*or.*" It did not do so in sec. 100.26(3), Stats. 1977, until after the word neglect and before the word "fails." Intentionally cannot modify "fails," since one who has intentionally failed to obey is one who has a mental purpose of refusal to obey and such use would be duplicitous.

The defendant argues that sec. 100.26(3), Stats. 1977, was meant to include only intentional conduct or, alternatively, that it violates due process to convict a person of a crime with no *mens rea*. This idea was rejected by the

U.S. Supreme Court and this court in several instances over the years. The first rejection in Wisconsin was in *State v. Hartfiel*, 24 Wis. 60 (1869), which involved the prosecution of a saloon keeper for serving a minor an intoxicating liquor when the statute did not include the words "knowingly" or "wilfully." The jurors were instructed that ignorance or mistake on the part of the accused as to the fact that the six-foot-one-inch person who was served was a minor was no defense. The court held:

"The act in question is a police regulation, and we have no doubt that the legislature intended to inflict the penalty, irrespective of the knowledge or motives of the person who has violated its provisions. Indeed, if this were not so, it is plain that the statute might be violated times without number, with no possibility of convicting offenders, and so it would become a dead letter on the statute book, and the evil aimed at by the legislature remain almost wholly untouched. To guard against such results, the legislature has, in effect, provided that the saloon keeper, or other vendor of intoxicating liquors or drinks, must know the facts—must know that the person to whom he sells is a *qualified drinker*, within the meaning of the statute; and, if not, he acts at his peril in disobeying the requirements of the law." *Id.* at 62.

The U.S. Supreme Court stated the history of crime without intent in *Morissette v. United States,* 342 U.S. 246 (1952) and declared:

"Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand, was congenial to an intense individualism and took deep and early root in American soil. . . .

"The industrial revolution multiplied the number of workmen exposed to injury from increasingly powerful and complex mechanisms, driven by freshly discovered sources of energy, requiring higher precautions by employers. Traffic of velocities, volumes and varieties unheard of came to subject the wayfarer to intolerable casualty risks if owners and drivers were not to observe new cares and uniformities of conduct. Congestion of cities

and crowding of quarters called for health and welfare regulations undreamed of in simpler times. Wide distribution of goods became an instrument of wide distribution of harm when those who dispersed food, drink, drugs, and even securities, did not comply with reasonable standards of quality, integrity, disclosure and care. Such dangers have engendered increasingly numerous and detailed regulations which heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare.

"While many of these duties are sanctioned by a more strict civil liability, lawmakers, whether wisely or not, have sought to make such regulations more effective by invoking criminal sanctions to be applied by the familiar technique of criminal prosecutions and convictions. This has confronted the courts with a multitude of prosecutions, based on statutes or administrative regulations, for what have been aptly called 'public welfare offenses.' These cases do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals. Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. Also, penalties

commonly are relatively small, and conviction does no grave damage to an offender's reputation. Under such considerations, courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime. This has not, however, been without expressions of misgiving.
"...

"It was not until recently that the court took occasion more explicitly to relate abandonment of the ingredient of intent, not merely with considerations of expediency in obtaining convictions, nor with the *malum prohibitum* classification of the crime, but with the peculiar nature and quality of the offense. We referred to '. . . a now familiar type of legislation whereby penalties serve as effective means of regulation,' and continued, 'such legislation dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger.' But we warned: 'Hardship there doubtless may be under a statute which thus penalizes the transaction though consciousness of wrongdoing be totally wanting.' *United States v. Dotterweich,* 320 U.S. 277, 280–81, 284." *Id.* at 251–56, 259–60.

In *State v. Dried Milk Products Co-operative,* 16 Wis. 2d 357, 114 N.W.2d 412 (1962), in considering sec. 348.-15(2)(c), Stats., which required certain weight limitations for vehicles operated on the highways, we held:

"This section is part of a welfare statute which generally creates a crime *malum prohibitum* for the doing of an act without requirement of intent. . . .
"...
"Keeping in mind that welfare statutes are *mala prohibita* and an exception to the general common-law rule that an intent of some blameworthiness is required, we must construe the statute in the light of the legislative history when the legislative intent is appropriately expressed in statutory language and such construction can be giv-

en without violence to the rule that criminal laws are to be strictly construed against the government.

"...

"Statutes of this nature, imposing criminal penalty irrespective of any intent to violate them, have for their purpose the requirement of a degree of diligence for the protection of the public which shall render a violation thereof impossible. *People v. Roby* (1884), 52 Mich. 577, 18 N.W. 365; *Reismier v. State* (1912), 148 Wis. 593, 135 N.W. 153; *Scott v. State* (1920), 171 Wis. 487, 177 N.W. 615; *Knecht v. Kenyon* (1923), 179 Wis. 523, 192 N.W. 82; *Commonwealth v. Ober* (1934), 286 Mass. 25, 189 N.E. 601. . . .

"Where legislative action is within the scope of the police power, fairly debatable questions as to reasonableness, wisdom, and propriety of action, are not for the determination of the court but for the legislative body. *State v. Ross* (1951), 259 Wis. 379, 48 N.W.2d 460; *State v. United Parking Stations* (1951), 235 Minn. 147, 50 N.W.2d 50; *Commonwealth v. Flickinger* (1949), 165 Pa. Super. 95, 67 Atl. 2d 779; *Jones v. Chicago* (1952), 348 Ill. App. 310, 108 N.E.2d 802; *People v. Breen* (1950), 326 Mich. 720, 40 N.W.2d 778." *Id.* at 359, 361, 362–63.

In *West Allis v. Megna,* 26 Wis. 2d 545, 133 N.W.2d 252 (1965), the court dealt with a statute prohibiting minors to be on tavern premises and held it imposed strict liability on tavern keepers. In upholding the law, the court held: "The purpose of the statute is simply 'to keep minors as patrons or customers out of taverns.'" This was held to be a proper application of the state's police power for the general welfare of its citizens.

The statement of purpose for creating sec. 100.26(3), Stats. 1977, is reflected in sec. 100.20(1) and (2):

"100.20 **Methods of competition and trade practices.** (1) Methods of competition in business and trade practices in business shall be fair. Unfair methods of competition in business and unfair trade practices in business are hereby prohibited.

"(2) The department, after public hearing, may issue general orders forbidding methods of competition in bus-

iness or trade practices in business which are determined by the department to be unfair. The department, after public hearing, may issue general orders prescribing methods of competition in business or trade practices in business which are determined by the department to be fair."

The statement of purpose as appears in subsecs. (1) and (2) reflect a concern of the legislature with protection of the public, and it has chosen a proper means of exercising its police power to protect the public welfare. The literal reading of the statute urged by the defendants would interfere with the substantive purpose of the legislature.

The legislative history of the present sec. 100.26(3), Stats. 1977, leads to the conclusion recited previously as to the word "intentionally" modifying only the word "refuses."

In 1921, the statute first appears in ch. 571, Laws of 1921.[5] At that time, neither the word "wilfully" nor "intentionally" were in the statute. However, the range of punishment then was substantially the same as now, *i.e.,* "be punished by a fine of not more than five thousand dollars or by imprisonment in the county jail for not more than one year, or by both such fine and imprisonment."

The Laws of 1923, ch. 366,[6] added responsibility for the acts of agents, as well as a principal and added the

---

[5] Ch. 571, sec. 1495–292, Laws of 1921, states:

"Any person who violates any provision of subsection 3 of section 1495–19 or subsection 5 of section 1495–20, or who violates or refuses, neglects or fails to obey any order or regulation made under section 1495–14, 1495–16 or 1495–17 shall, upon conviction thereof, be punished by a fine of not more than five thousand dollars or by imprisonment in the county jail for not more than one year, or by both such fine and imprisonment."

[6] Ch. 366, sec. 1495–292, Laws of 1923, states:

"Any person, *acting either personally or through an agent or as agent of another,* who *wilfully* violates any provision of subsection

word "wilfully." However, "wilfully" modified only "violates" and separated "violates" from "refuses, neglects or fails to obey" with the conjunctive *or*. Significantly, the penalty remained constant.

Then, in a revisor's bill in 1935, Laws of 1935, ch. 550, sec. 366, the statute took its present form and "wilfully violates" was eliminated and the word "intentionally" appears before the word "refuses." "Refuses" is followed by a comma, not the conjunctive word *or*, and, therefore, for reasons already stated in this opinion, intentionally was meant to modify "refuses."

In *State v. Morales,* 51 Wis. 2d 650, 656, 187 N.W.2d 841 (1971), we held:

"The United States Supreme Court has never enunciated a constitutional mandate requiring proof of *mens rea* in all cases before an accused can be held accountable for his acts. *Powell v. Texas* (1968), 392 U.S. 514, 535, 88 Sup. Ct. 2145, 20 L. Ed. 2d 1254. The states are free to create crimes which do not require proof of *mens rea. Roberts v. State* (1969), 41 Wis. 2d 537, 545, 164 N.W. 2d 525."

This remains the law today. In *Powell v. Texas, supra,* at 545, Justice Black, in a concurring opinion, gave as the basis for his determination, the following, which still holds true: "The criminal law is a social tool that is employed in seeking a wide variety of goals."

3 of section 1495–19 or subsection 5 of section 1495–20, or who *wilfully* violates or refuses, neglects or fails to obey any order or regulation made under section 1495–14, 1495–16 or 1495–17 shall *be guilty of a misdemeanor and for each and every such offense shall,* upon conviction thereof, be punished by a fine of not more than five thousand dollars or by imprisonment in the county jail for not more than one year, or by both such fine and imprisonment."

This court expressed the same thought as Justice Black in *Pauly v. Keebler,* 175 Wis. 428, 439, 185 N.W. 554 (1921):

"It is not the province of the courts to set aside statutes merely because they may be deemed unwise or because it may be feared that they will work inconvenience or hardship. Subject to the limitations imposed by the constitution the legislature has very broad powers in order to promote the public welfare, to create criminal offenses and impose punishment therefor. These are rules so elementary and long established that it is unnecessary to cite the many adjudicated cases on which they are based."

In *State v. Collova,* 79 Wis. 2d 473, 255 N.W.2d 581 (1977), the court recognized that liability-without-fault punitive statutes in Wisconsin were not violative of constitutional due process standards; however, the court also concluded that the legislature had intended a mandatory, though unstated, fourth element of proof. The fourth element was that the defendant had cause to believe his driver's license [privilege] might be revoked or suspended. It is apparent the reason for the fourth unstated requirement was that a conviction carried a mandatory jail sentence and an administrative revocation of the defendant's operating privileges for a period of one year. Sec. 343.31(1) (f) and (3), Stats. The court was obviously concerned with a statute with mandatory punishment for a violation, and no allowance for judicial discretion as a protection for a violation that did not include any intentional or negligent wrongdoing. This was reflected in the *Collova* language at 486:

"Absent some unmistakable indication in the words of the statute, we are unwilling to conclude that the legislature intended to subject a defendant who is innocent of any negligent or intentional wrongdoing to the harsh consequences a conviction under sec. 343.44 entails. To inflict substantial punishment on a person who is inno-

cent of any intentional or negligent wrongdoing offends the sense of justice and is ineffective."

What concerned the *Collova* court is not applicable to the present statute, sec. 100.26 (3), Stats. 1977, since the wrongdoing punished is either an "intentional refusal" or "neglect" or "failure," all of which suggest in varying degrees, direct or implied knowledge of a wrongdoing. The statute is obviously intended to implement a high standard of care to protect the public; to accomplish this, it allowed a convicted wrongdoer to be punished pursuant to judicial discretion, in order to accomplish the public welfare concern that underlies the statute.

The defendants held themselves out to the public as persons having an expertise in home improvement. They sought out, by advertising and referrals, those persons in society who were in need of help and for the most part uninformed as to the law and construction practices. It is reasonable and necessary for the legislative body to protect the innocent who need services by placing a burden of regularity, evenhandedness and legal guidelines on the purveyors of the services. It is as much a part of competition to be honest, forthright and fulfilling as it is to work for a lower bid. The public does not always recognize this. Good, honest entrepreneurs recognize it and are not hurt by the law holding them strictly liable in a punitive statute which requires minimum standards of behavior. It is not offensive to require starting dates and completion dates to be stated in a contract. It would appear offensive only to persons not wishing to be held to any semblance of accountability.

Under sec. 100.26 (3), Stats. 1977, there could be a problem of notice to a defendant as to what charge he had to defend against; *i.e.*, one of intentional refusal, one of neglect to obey a requirement of the administrative

rules, or one of failure to obey an order. Any of these forms of conduct violates sec. 100.26(3) if proven and, therefore, the defendant is entitled to notice in order to prepare a defense. They are separate and can be distinct ways of committing a violation of the same statute.

The district attorney in this case charged each of the defendants specifically according to the evidence he believed available, and subsequently proved their guilt. In all the multiple counts, the defendants were charged with a failure to obey a regulation. These were additional charges under the home improvement rules and were separate from the charges of theft by contractor.

Since each of the three proscribed courses of conduct may be distinct, the alleged method of the crime must be specifically charged to avoid multiplicitous charges for the same conduct or acts. Care was correctly taken in this case in the specificity of charges brought; the conduct of the defendants to be proven was clearly set forth. Therefore, the notice problems to defendants discussed in *Manson v. State,* 101 Wis. 2d 413, 304 N.W.2d 729 (1981), never arise in regard to this case.

The original information filed in this case charged each defendant with intentionally engaging in an unfair home improvement trade practice which was followed by a "to wit" allegation of the unlawful practice. An amended information was filed with the trial court's consent. The amended information did not charge intentional acts for the home improvement practices. They were instead referred to as an "unfair home improvement trade practice, to wit." After this statement in each count, the specifics of the alleged unlawful practice were set forth, *i.e.,* either failed to state in the contract the dates or time periods on or within which the work was to begin or be completed, or the defendants failed to be-

gin or complete the work on the dates or within the time period represented by the defendant or defendants.

The defendants argue that the district attorney will never allege intentional refusal since that is the only conduct requiring a showing of *mens rea*. The claim is that the district attorney will choose neglect or failure as a charge more easily satisfied as to the state's burden. This ignores the integrity of district attorneys in bringing the proper charge, and also ignores the potential notice problem. In addition, bringing a lesser, more easily provable charge may not fit the evidence available of defendants' conduct, and a relevancy problem may be created for the state during the trial. Finally, the argument fails to recognize that the district attorney may choose to charge "intentional refusal" if he believes that evidence is present to prove defendants' guilt, and then ask the trial court for high limits of the wide-range of penalty available.

By specific charging based upon the evidence available, no problem of submission of the verdict to a jury arises in order to have a unanimous verdict consistent with the defendant's proven conduct. The entire problem raised by *United States v. Gipson*, 553 F.2d 453 (5th Cir. 1977) as discussed in the *Manson* case, *supra*, will therefore be avoided.

*By the Court.*—The decision of the court of appeals is affirmed.

SHIRLEY S. ABRAHAMSON, J. (*dissenting*). I dissent. I conclude that the defendants' convictions of violations of sec. 100.26(3), Stats. 1977, cannot be sustained because an element of the crime, namely the defendants' state of mind whether called mens rea, criminal intent, guilty knowledge or scienter, was not proved.

The defendants were charged under sec. 100.26(3), Stats. 1977, with failing to obey regulations promulgated

by the Department of Agriculture, Trade & Consumer Protection.[1] Sec. 100.26(3) specifies that "[a]ny person . . . who *intentionally* refuses, neglects or fails to obey any regulation made under . . . s. 100.20, shall, for each offense . . . be fined not less than $25 nor more than $5,000 or imprisoned in the county jail for not more than one year or both." (Emphasis added.) In contrast with the majority, I conclude that the word "intentionally" in sec. 100.26(3), Stats. 1977, modifies not only the verb "refuses," but also the verbs "neglects" and "fails."

The state asserts that the elements which it had to prove to sustain the convictions are:

(1) Defendants entered into a home improvement contract with a consumer.[2]

---

[1] The regulations were promulgated pursuant to sec. 100.20, Stats. 1977, the relevant subsections providing as follows:

"(1) Methods of competition in business and trade practices in business shall be fair. Unfair methods of competition in business and unfair trade practices in business are hereby prohibited.

"(2) The department, after public hearing, may issue general orders forbidding methods of competition in business or trade practices in business which are determined by the department to be unfair. The department, after public hearing, may issue general orders prescribing methods of competition in business or trade practices in business which are determined by the department to be fair."

[2] Ag 110.01(1), Wis. Adm. Code, defines home improvement and Ag 110.01(3), Wis. Adm. Code, defines home improvement contract as follows:

"Ag 110.01 **Definitions.** (1) 'Home improvement' means the remodeling, altering, repairing, painting, or modernizing of residential or non-commercial property, or the making of additions thereto, and includes, but is not limited to, the construction, installation, replacement, improvement or repair of driveways, sidewalks, swimming pools, terraces, patios, landscaping, fences, porches, garages, basements and basement waterproofing, fire protection devices, heating and air-conditioning equipment, water softeners, heaters and purifiers, wall-to-wall carpeting or attached or inlaid floor coverings, and other changes, repairs or improvements made

(2) Defendants received money prior to the completion of their obligations under the contract[3] and a written contract executed by the defendants failed to set forth the dates or time period on or within which the work was to begin and be completed.[4]

(3) Defendants failed to begin or complete work on the dates or within the period specified in the home improvement contract.[5]

---

in or on, attached to or forming a part of the residential or non-commercial property, but does not include the construction of a new residence. The term extends to the conversion of existing commercial structures into residential or non-commercial property."

"(3) 'Home improvement contract' means an oral or written agreement between a seller and an owner or a seller and a tenant or lessee of residential or non-commercial property, or a seller and a tenant or lessee if the tenant or lessee is to be obligated for the payment of home improvements made in, to, or upon such property, and includes all agreements under which the seller is to perform labor or render services for home improvements, or furnish materials in connection therewith."

[3] Ag 110.05(1)(a) provides as follows:

"Ag 110.05 **Home improvement contract requirements.** (1) The following home improvements contracts and all changes in the terms and conditions thereof, shall be in writing:

"(a) Contracts requiring any payment of money or other consideration by the buyer prior to completion of the seller's obligation under the contract."

[4] Ag 110.05(2)(d) provides as follows:

"(2) Home improvement contracts and all changes in the terms and conditions thereof, required under this section to be in writing, shall be signed by all parties thereto, and shall clearly and accurately set forth in legible form all terms and conditions of the contract, and particularly the following:

". . .

"(d) The dates or time period on or within which the work is to begin and be completed by the seller."

[5] Ag 110.02(7)(b), Wis. Admin. Code, provides:

"Ag 110.02 Prohibited trade practices. No seller shall engage in the following unfair methods of competition or unfair trade practices:

The state need not prove that the work contracted for was not completed; that the work completed was unsatisfactory; that the consumer paid the defendants any sum in addition to the down payment; that the defendants failed to return the down payment to the consumer; or that the defendants' contract was deleterious to competition. Further the state asserts that it need not prove scienter. Thus apparently the state's position is that a home improvement contractor is guilty of a crime if the home improvement contractor—without intending to harm the consumer or to violate the law and without actually harming the consumer—fails to specify in a written contract the time period for doing the work or begins and completes the work after the dates specified in the contract without justification (as defined in the regulations).

The principal issue in this case is one of statutory construction: Does sec. 100.26(3) always require proof of scienter, *i.e.*, proof that the defendant acted "intentionally." The second issue of the case, depending on resolution of the first issue, is what does "strict liability" mean or what does "intentionally" mean. The final issue is whether the statute violates due process if scienter is not required as an element of the offense.

I.

This court has repeatedly stated that "the aim of all statutory construction is to discern the intent of the

"...

"(7) PERFORMANCE....

"(b) Fail to begin or complete work on the dates or within the time period specified in the home improvement contract, or as otherwise represented, unless the delay is for reason of labor stoppage, unavailability of supplies or materials, unavoidable casualties, or any other cause beyond the seller's control. Any changes in the dates or time periods stated in a written contract shall be agreed to in writing."

legislature," *Green Bay Packaging, Inc. v. ILHR Dept.*, 72 Wis. 2d 26, 35, 240 N.W.2d 422 (1976), and that a "cardinal rule in interpreting statutes" is to favor a construction which will fulfill the purpose of the statute over a construction which defeats the manifest object of the act. *Student Asso., U. of Wis.-Milw. v. Baum*, 74 Wis. 2d 283, 294–95, 246 N.W.2d 622 (1976). Where one of several interpretations of a statute is possible, the court must ascertain the legislative intention from the language of the statute in relation to its context, scope, history, and object intended to be accomplished. *State ex rel. First Nat. Bank & Trust Co. of Racine v. Skow*, 91 Wis. 2d 773, 779, 284 N.W.2d 74 (1979).

The instant case differs from the usual case raising the issue of whether the legislature intended scienter to be an element of a crime, in that in the usual case, the statutory definition of the crime is silent as to the element of scienter.[6] In the case at bar, as the state and the majority acknowledge, the legislature specifically includes scienter in the definition of the offense; scienter is required for at least one type of violation of sec. 100.-26(3), namely the state must prove that a defendant intentionally refuses to obey the regulation. While in the usual case the state urges this court not to read the element of scienter into a statute which is silent as to mens rea, in this case the state urges us to read the statute to create three ways of committing a crime, only one of which requires proof of scienter. The state is in effect asking the court to read scienter out of a portion of the statute.

The cases and commentators suggest that courts consider the following factors in deciding whether a statute should be interpreted as requiring scienter as an element of the crime or as imposing liability without fault:

---

[6] *See, e.g., State v. Collova*, 79 Wis. 2d 473, 480, 255 N.W.2d 581 (1977).

1. The language of the statute.
2. The legislative history of the statute.
3. The seriousness of the penalty.
4. The purpose of the statute.
5. The practical requirements of effective law enforcement.[7]

---

[7] For a discussion of liability without fault and mens rea, *see,* *e.g.,* LaFave & Scott, *Criminal Law* secs. 26, 27, 31, 47 (1972); Hall, *General Principles of Criminal Law* Ch. X (2d ed. 1960); *Perkins on Criminal Law,* 799–809 (2d ed. 1969); Sayre, *Public Welfare Offenses,* 33 Colum. L. Rev. 55 (1933); Perkins, *Ignorance and Mistake in Criminal Law,* 88 U. of Pa. L. Rev. 35 (1939); Remington & Halstead, *The Mental Element in Crime—A Legislative Problem,* 1952 Wis. L. Rev. 644; Remington, *Liability Without Fault Criminal Statutes—Their Relation to Major Developments in Contemporary Economic and Social Policy: The Situation in Wisconsin,* 1956 Wis. L. Rev. 625; Hall, *Ignorance and Mistake in Criminal Law,* 33 Ind. L. J. 1 (1957); Mueller, *On Common Law Mens Rea,* 42 Minn. L. Rev. 1043 (1958); Wasserstrom, *Criminal Liability in the Criminal Law,* 12 Stan. L. Rev. 731 (1960); Packer, *Mens Rea and The Supreme Court,* 1962 The Supreme Court Review 107; Kadish, *Some Observations on the Use of Criminal Sanctions in Enforcing Economic Regulations,* 30 U. Chi. L. Rev. 423 (1963); Dubin, *Mens Rea Reconsidered: A Plea for a Due Process Concept of Criminal Responsibility,* 18 Stan. L. Rev. 322 (1966); Cass, *Ignorance of the Law: A Maxim Reexamined,* 17 Wm. & Mary L. Rev. 671 (1976); O'Connor, *Mistake and Ignorance in Criminal Cases,* 39 Modern L. Rev. 644 (1976); Dutile & Moore, *Mistake and Impossibility: Arranging a Marriage Between Two Difficult Partners,* 74 Nw. U. L. Rev. 166 (1979); Feinberg, *Toward a New Approach to Proving Culpability: Mens Rea and The Proposed Federal Criminal Code,* 18 Am. Cr. L. Rev. 123 (1980); Case Notes, *Criminal Law—Mistake of Law—A Valid Defense,* 11 DePaul L. Rev. 329 (1962); Note, *Liability Without Fault: Logic and Potential of a Developing Concept,* 1970 Wis. L. Rev. 1201; *United States v. Balint,* 258 U.S. 250 (1922); *United States v. Dotterweich,* 320 U.S. 277 (1943); *Morissette v. United States,* 342 U.S. 246 (1952); *Lambert v. California,* 355 U.S. 225 (1957); *United States v. Freed,* 401 U.S. 601 (1971); *United States v. International Minerals & Chemical Corp.,* 402 U.S. 558 (1971); *United States v. Ehrlichman,* 546 F.2d 910 (D.C. Cir.

These factors were recently summarized by this court in *State v. Collova, supra,* 79 Wis. 2d at 482, 485, as follows:

"The problem is determining where the legislature intended to draw the line between offenses which do and do not require scienter. Liability without fault has been applied in Wisconsin, as the above cited cases demonstrate, in 'regulatory criminal statutes.' The complex industrial state of the 20th century has generated increased social regulation and has adapted the criminal law, originally designed to punish the culpable individual, to enforce obedience to regulatory statutes. These regulatory statutes are concerned primarily with the protection of social and public interests, with the prevention of direct and widespread social injury. They are more concerned with the injurious conduct than with the question of individual guilt or moral culpability. The penalties imposed are generally light. The usual rationale for strict liability statutes is that the public interest is so great as to warrant the imposition of an absolute standard of care —the defendant can have no excuse for disobeying the law. Because of the multitude of cases arising under these regulatory statutes, there is a need for quick, simple trials unhindered by examinations of the subjective intent of each defendant.

". . .

"[W]here the statute is not explicit, one of the principle [sic] indexes courts consider on the question whether some element of knowledge is required is the severity of the penalty involved."

In determining legislative intent and in analyzing the five factors outlined above, a key principle is that "the element of scienter is the rule rather than the exception

1976); *United States v. Barker,* 514 F.2d 208, 227 (D.C. Cir. 1975) (concurring opinion); *Holdridge v. United States,* 282 F.2d 302, 310 (8th Cir. 1960); *State v. Alfonsi,* 33 Wis. 2d 469, 476, 147 N.W.2d 550 (1960); *Welch v. State,* 145 Wis. 86, 129 N.W. 656 (1911); *State v. Hartfiel,* 24 Wis. 60 (1869).

in our criminal jurisprudence."[8] This court has frequently recognized that a primary ethical foundation of the criminal justice system is that criminal liability is premised on individual blameworthiness. Reviewing these factors in the context of the case at bar, I conclude that they weigh heavily in favor of holding that the legislature intended scienter to be a necessary element of sec. 100.26(3).[9]

*Language of the Statute.* As the majority concedes, the statute can reasonably be read so that intentionally modifies all three verbs. The majority then labors mightily to limit "intentionally" to modifying the verb "refuses" and to define "refuses," "neglects" and "fails" as three totally separate and distinct ways of committing a single offense. *Manson v. State,* 101 Wis. 2d 413, 428, 284 N.W.2d 703 (1981). There are several flaws in the majority's analysis. First, the majority defines "refuses" as meaning intentional conduct, and the majority's conclusion that the word "intentionally" modifies only the verb "refuses" renders the word "intentionally" redundant. Second, the majority's dictionary definitions of the

---

[8] *State v. Alfonsi,* 33 Wis. 2d 469, 476, 147 N.W.2d 556 (1960). *See also Dennis v. United States,* 341 U.S. 494, 500 (1951).

"In construing a statute the court should not hold that it dispenses with the necessity for a criminal intent unless such an intent on the part of the legislature is clear beyond any reasonable doubt." Clark & Marshall, *Crimes,* secs. 5, 20, p. 309 (9th ed. 1967).

[9] The majority's discussion of legislative intent raises numerous problems and difficulties not specifically dealt with in the text of this dissent. For example, the majority gratuitously interprets sec. 52.05(1), Stats. 1979–80, and among other interpretations, appears to equate the adverbs "wilfully" and "intentionally." It gratuitously interprets sec. 947.15, Stats. 1979–80, and equates the verb "neglect" with the noun "neglect." It also *sua sponte* raises and answers questions about charges in future prosecutions and the need for jury unanimity under *Manson v. State,* 101 Wis. 2d 413, 304 N.W.2d 729 (1981).

three verbs—and especially the definitions of neglect and fail—demonstrate that the meanings of the three verbs are not totally different and in fact overlap. Third, the majority intimates that the legislature intended to set forth a full range of degrees of scienter and a wide range of penalties. *Supra,* p. 268. Thus the mental element which may be proved ranges from intentional conduct ("intentionally refuses"), to negligent conduct ("neglects" which the majority intimates is the equivalent of negligence) [10] to conduct without fault ("fails" which the majority in some parts of its opinion appears to say requires no proof of any mental element.) The majority seems to conclude that the legislature intended the trial court to select from the wide range of penalties on the basis of the degree of scienter, or lack thereof, charged or proven in each case. *Supra,* p. 277. Although the legislature failed to express this concept in the language of the statute, the court reads the statute as creating three separate ways (of varying degrees of scienter) of committing a single crime.[11]

*Legislative History.* Although the legislative history does not provide a definitive answer to the proper construction of the statute, it does point toward the legislature intending scienter to be an element of the crime. As the majority points out, the original 1921 version of sec. 100.26(3) does not include any words indicating that scienter is an element of the crime. In 1923 the legislature revised sec. 100.26(3), specifically adding the ele-

[10] *See State v. Balestrieri,* 87 Wis. 2d 1, 7, 274 N.W.2d 269 (Ct. App. 1978), aff'd by divided court, 96 Wis. 2d 361, 291 N.W.2d 579 (1980).

[11] Compare sec. 100.26(3) with statutes in which the legislature does expressly provide different penalties for different degrees of scienter. *See, e.g.,* sec. 948.18(2), Stats. 1979: "Any person violating s. 948.04, 948.10 or 948.11 is subject to a Class D forfeiture. Any person who intentionally or negligently violates the aforementioned section is guilty of a Class B misdemeanor."

ment of scienter. The 1923 statute reads "wilfully violates or refuses, neglects or fails to obey any order or regulation." The 1923 statute raises the same question raised in this case, namely whether the word signifying state of mind, *i.e.* "wilfully," which is used only once, modifies each of the verbs. The 1923 statute can be read to penalize:

(A) One who *wilfully violates* any order, one who *refuses* to obey any order, one who *neglects* to obey any order, and one who *fails* to obey any order; or

(B) One who *wilfully violates* any order, one who *wilfully refuses* to obey any order, one who *wilfully neglects* to obey any order, or one who *wilfully fails* to obey any order.

Although the state's brief suggests that the statute can be read to punish

(C) One who *wilfully violates* any order or one who *wilfully refuses* to obey any order or one who *neglects* to obey any order or one who *fails* to obey any order,

the state at oral argument properly acknowledged that this reading is not plausible.

In 1935, sec. 100.26(3) was amended, but the legislative history shows that the revision was not intended to change the meaning of the statute.[12] The phrase "wilfully violates or refuses, neglects or fails to obey any order or regulation" was eliminated and replaced by the

---

[12] The Drafting Note to the 1935 amendment states that no change of meaning was intended when sec. 100.26(3) was revised as part of the 1935 revision and codification of the statutes administered by the department of agriculture. Senate Bill No. 454, 1935 Sess., states: "This bill is a revision and codification of the statutes administered by the department of agriculture and markets. . . . The bill is a rewriting of the present law with almost no changes in substance. The changes in language are for simplification and clarification. A note is appended wherever the change of language may have changed the meaning." No such note is appended to sec. 100.26(3), Stats. Thus the 1935 statute should be read as was the 1923 statute. *Guse v. A.O. Smith Corp.*, 260 Wis. 403, 406, 51 N.W.2d 24 (1952).

phrase used in the present statute, namely "intentionally refuses, neglects or fails to obey any regulation." Since the 1935 revision did not change the meaning of the 1923 statute, both statutes must be construed in such a way that the words "wilfully" and "intentionally" modify the verb "refuses." Thus the construction of the 1923 statute set forth in (A) above cannot be correct. It is conceded that the word "wilfully" in the 1923 statute cannot be construed to modify only the verbs "violates" and "refuses," and thus the construction set forth in (C) above is not correct. The only other possible construction of the 1923 statute is that set forth in (B) above. Therefore, the 1923 and 1935 statutes can be interpreted in the same way only if the word "wilfully" in the 1923 statute is construed as modifying "violates," "refuses," "neglects" and "fails" (see the construction in (B) above) and the word "intentionally" in the 1935 and present statute is construed as modifying the three verbs "refuses," "neglects" and "fails."

The legislative history demonstrates that in 1923 the legislature deliberately moved away from the 1921 statute which was silent as to scienter to a statute requiring scienter. This express addition of the element of scienter in 1923 is easily understood when we remember that administrative regulations were not published in one convenient, accessible book and thus were "not sufficiently known" and were "not sufficiently available." 1940 Wis. Admin. Code (Red Book), Introduction. Under these circumstances it is likely the legislature intended that only wilful violations of the regulations be crimes.

*Severity of the Penalty.* One of the principal indices courts consider to determine whether the legislature intended to require scienter is the severity of the penalty involved. *State v. Collova,* 79 Wis. 2d 473, 485, 255 N.W. 2d 581 (1977). Penalties imposed on the basis of strict liability "commonly are relatively small and conviction

does no grave damage to an offender's reputation." *Morissette v. United States,* 342 U.S. 246, 256 (1922). *See also United States v. Brown,* 578 F.2d 1280, 1284 (9th Cir. 1978).

In the instant case the potential maximum penalty is relatively severe in the context of criminal sanctions. The penalty under sec. 100.26(3)—up to one-year imprisonment in the county jail or a fine from $25 to $5,000, or both—is more severe—at least as to the term of imprisonment—than the penalty for the highest classification of misdemeanors in the criminal code. The penalty for a Class A misdemeanor under the criminal code is a fine not to exceed $10,000 or imprisonment in the county jail not to exceed nine months or both.[13]

The state and the majority would have us look not at the maximum penalty possible but at the minimum penalty allowable, and the majority apparently reasons that the range of penalties illustrates that the legislature meant the statute to include various degrees of scienter. One way the majority opinion can be read is that it concludes that any problem caused by the severity of the sentence is cured by the prosecutors exercising discretion in selecting persons for prosecution and in charging the appropriate degree of scienter, and by the trial courts exercising discretion in imposing the severest penalties only on those who acted most culpably. This solution is not satisfactory; the solution merely dispenses with the safeguards of a trial on the critical issue of blameworthiness. The defendants in this case were charged with and convicted of "failing" to obey the regulations, the least culpable behavior under the reasoning of the majority. Yet the defendants were sentenced to one-year terms of imprisonment on each charge, several to be served con-

[13] Class A misdemeanors include crimes of damage to property and person, and most Class A misdemeanors appear to require scienter as an element of the crime. *See, e.g.,* secs. 943.395, 943.41, 943.50, 943.61, 940.19, 941.01, 941.10, 941.13, 941.22, and 941.20, Stats. 1979-80.

secutively. I recognize that the defendants had been previously charged with crimes involving property improvements and that execution of the present sentences was stayed pending probation. Nevertheless, if either defendant violates one of the numerous terms of probation, he will be subject to a lengthy period of imprisonment on conviction of "strict liability" offenses.

In my view, a determinative factor in the case at bar is the severity of the penalty. I do not believe the legislature intended a person who is blameless to be subjected to the harsh consequences sec. 100.26(3) imposes. It is one thing to accept the idea that a blameless person might occasionally be required to pay a fine and quite another to speak of a blameless person spending a year in county jail.

The Model Penal Code takes the position that whenever conduct is punishable by imprisonment, the statute should require scienter to be proved. The Model Penal Code announces "a frontal attack on absolute or strict liability in penal law, whenever the offense carries a *possibility* of sentence of imprisonment." Model Penal Code sec. 2.05, Comment, pp. 140–146 (Tent. Draft No. 4, 1955). Under the Code a conviction resting on strict liability may result only in a civil penalty of monetary forfeiture. The rationale for the position taken in the Model Penal Code is explained as follows:

"This section makes a frontal attack on absolute or strict liability in penal law, whenever the offense carries a possibility of sentence of imprisonment. The method used is not to abrogate such liability but to provide that when conviction rests upon that basis the grade of the offense is reduced to a violation, which is not a "crime" and under Sections 1.04(5) and 6.02 may result in no other sentence than a fine or fine and forfeiture or other civil penalty. If, on the other hand, the culpable commission of the offense has been established, the reduction in grade does not occur. Negligence is, however, treated as sufficient culpability in cases of this kind.

"This position is affirmed not only with respect to offenses defined by the Penal Code; it is superimposed on the entire corpus of the law, so far as penal sanctions are involved. Since most strict liability offenses are involved in special, regulatory legislation, this superimposition is essential if the problem is to be attacked. We have no doubt that the attempt is one that should be made. The liabilities involved are indefensible in principle, unless reduced to terms that insulate conviction from the type of moral condemnation that is and ought to be implicit when a sentence of imprisonment may be imposed. In the absence of minimal culpability, the law has neither a deterrent nor corrective nor an incapacitative function to perform.

"It has been argued, and the argument undoubtedly will be repeated, that absolute liability is necessary for enforcement in a number of the areas where it obtains. But if practical enforcement can not undertake to litigate the culpability of alleged deviation from legal requirements, we do not see how the enforcers rightly can demand the use of penal sanctions for the purpose. Crime does and should mean condemnation and no court should have to pass that judgment unless it can declare that the defendant's act was wrong. This is too fundamental to be compromised. The law goes far enough if it permits the imposition of a monetary penalty in cases where strict liability has been imposed. . . ." Model Penal Code sec. 2.05, Comment, p. 140 (Tent. Draft No. 4, 1955).[14]

---

[14] The Model Penal Code further concludes that sanctions for violations of administrative regulations, in contrast to sanctions for violations of statutes, should be primarily administrative in character, e.g. suspension of license, financial penalties or short terms of imprisonment in case of knowing or repeated violations. See Model Penal Code sec. 206.04 (Tent. Draft No. 2, p. 121 (1954)).

Professor Packer commented on the inappropriateness of the criminal sanction in the absence of scienter as follows:

"[To] punish conduct without reference to the actor's state of mind is both inefficacious and unjust. It is inefficacious because conduct unaccompanied by an awareness of the factors making it criminal does not mark the actor as one who needs to be subjected to punishment in order to deter him or others from behaving similarly in the future, nor does it single him out as a socially dan-

The severity of the penalty lends support to the view that the legislature did not intend sec. 100.26(3) to be used as the basis for prosecuting every unintended violation of a regulation regardless of fault. An "unintentional" violation works no major public injury. Of course persistent violations of the regulations must be stopped, and the penal sanctions imposed by sec. 100.26(3) are appropriate for deliberate (or even negligent) defiance or evasion of the regulations. Where there are persistent violations it is quite feasible to prove, whether directly or circumstantially, some level of culpability.

*Purpose of the Statute.* In *State v. Collova, supra,* 79 Wis. 2d at 486, we said that the inquiry as to the legislative intent of whether scienter is required, "reduced to its simplest terms, may be stated to be whether the statute appears on balance to be designed to punish wrongdoers or to implement a high standard of care on the part of the public." When the legislature's goal is primarily to regulate, to accomplish a social good, to obtain a high standard of care, proof of a criminal state of mind is eliminated to achieve the desired result.

The development of regulatory criminal statutes which do not require scienter, creating what has become known as public welfare offenses, has been described in numerous prior cases. *See, e.g., Morissette v. United States,* 342 US 246, 259–260 (1952); *State v. Hartfiel,* 24 Wis 60 (1869); *State v. Dried Milk Products Co-Operative,* 16 Wis. 2d 357, 362, 114 N.W.2d 412 (1962); *State v. Collova, supra* 79 Wis. 2d at 479–486. I recognize that no precise definition of public welfare offenses can be stated and that no precise line can be drawn between

gerous individual who needs to be incapacitated or reformed. It is unjust because the actor is subjected to the stigma of a criminal conviction without being morally blameworthy. Consequently, on either a preventive or retributive theory of criminal punishment, the criminal sanction is inappropriate in the absence of mens rea." Packer, *Mens Rea and the Supreme Court,* 1962 Supreme Court Review 107, 109.

public welfare offenses and other crimes.[15] Neverthe-
less if we are to retain the concept that certain offenses
are punishable as crimes without proof of scienter,
we should apply the indices which we have set forth in
previous cases to distinguish public welfare offenses
from other crimes. One index is the purpose of the stat-
ute. The purpose of enacting public welfare offenses is to
protect the public safety, health, morals and general wel-
fare. " 'In the interest of the larger good, [such legisla-
tion] puts the burden of acting at hazard upon a person
otherwise innocent but standing in responsible relation to
a public danger.' " *Morissette v. United States,* 342 U.S.
246, 259–260 (1952). *See also City of West Allis v.
Megna,* 26 Wis. 2d 545, 548, 133 N.W.2d 252 (1963) ;
*State v. Dried Milk Products Co-op.,* 16 Wis. 2d 357, 362,
114 N.W.2d 412 (1962) ; *State v. Hartfiel,* 24 Wis. 60
(1869).

Although one purpose of sec. 100.20, pursuant to which
the regulations in the case at bar were issued, is to im-
plement a high standard of care in the public's inter-
est of protecting competition, I conclude that an
additional purpose of sec. 100.20, and the primary
purpose of the regulations in the case at bar and of
sec. 100.26(3), is to punish wrongdoers. If the pri-
mary purpose of sec. 100.26(3) is to punish wrong-

---

[15] "All criminal enactments in a sense serve the double purpose
of singling out wrongdoers for the purpose of punishment or cor-
rection and of regulating the social order. But often the impor-
tance of the one far outweighs the other. Crimes created primarily
for the purpose of singling out individual wrongdoers for punish-
ment or correction are the ones commonly requiring *mens rea;* po-
lice offenses of a merely regulatory nature are frequently enforce-
able irrespective of any guilty intent." Sayre, *Public Welfare Of-
fenses,* 33 Colum. L. Rev. 55, 72 (1933).

Professor Kadish commented that "the distinction between of-
fenses that regulate and those that penalize in the traditional
sense proves inadequate to divide the waters." Kadish, *Some Ob-
servations on the Use of Criminal Sanctions in Enforcing Econom-
ic Regulations,* 30 U. of Chi. L. Rev. 423, 443 (1963).

doers, the legislature must have intended that scienter be an element of the criminal offense set forth in sec. 100.26(3). I reach these conclusions for several reasons.

First, strict liability has generally been imposed on people who engage in acts which in and of themselves are not innocent or on people who engage in unusual or highly regulated activities and who may reasonably be held to know of and conform to government regulations. Such is not the case here.

Unlike the usual strict liability statutes which affect special, highly regulated businesses or activities such as drugs, intoxicating liquors, or firearms, sec. 100.20 and the regulations adopted under sec. 100.20, the violation of which are penalized under sec. 100.26(3), Stats., affect potentially all business people in the state. There appear to be 16 chapters and 79 pages of regulations in the administrative code, violations of which constitute crimes under sec. 100.26(3). These provisions cover a multitude of businesses and products. The comments of Wisconsin Assistant Attorney General James D. Jeffries, in an article entitled *Protection for Consumers Against Unfair and Deceptive Business*, 57 Marq. L. Rev. 559, 586 (1974), illustrate this point. Jeffries noted that Ag ch. 124, Wis. Adm. Code, entitled "Price Comparison Advertising", "is one of the . . . most complex rules of the Department of Agriculture. . . . [and] may also prove to be the most far-reaching since virtually every seller engages in some form of price comparison advertising."

Thus when the majority decides that the legislature did not intend that scienter be proved for violations of home improvement regulations, it ignores the fact that its decision governs violations not only of the regulations of home improvement contracts but also of regulations which potentially govern every person engaged in almost any trade or business in this state. I find it hard to believe that the legislature intended criminal sanctions

ranging up to a $5,000 fine and one year imprisonment to be imposed on each business person in the state who without fault fails to comply with one of the multitude of administrative regulations adopted under sec. 100.20, Stats.

Second, most of the home improvement regulations deal with false statements and misrepresentations and thus prescribe offenses which are supplementary to and extensions of the common law crimes of larceny, false pretences and cheat. The purpose of these regulations is to prevent unscrupulous, fraudulent business practices which harm individual consumers. Many other regulations adopted pursuant to sec. 100.20 have a similar purpose. It is apparent that the Department of Agriculture, Trade and Consumer Protection has interpreted sec. 100.20 to authorize regulations to protect the pocket book of the individual consumer. These regulations primarily expand common-law and statutory property offenses; they do not primarily protect the public safety or the physical welfare or economic order of the community.[16] Because the regulations of Ag ch. 110 (as well as other regulations) proscribe in large part variants of the classic larceny offense, a traditional property offense protecting individual private property, and because ordinarily scienter is an element of such an offense at common law, *Morissette v. United States,* 342 U.S. 246, 255–256 (1952), I conclude that the legislature intended scienter to be an element of sec. 100.26(3).[17]

---

[16] The two particular regulations in issue here, one requiring performance according to the contract and the second requiring the written contract to contain certain provisions, may be viewed as "regulatory"—"housekeeping"—in nature, rather than definitions of substantive criminal fraud in business transactions. These two regulations however aid in the enforcement of the "business fraud regulations."

[17] The majority's conclusion that if the consumer is to be protected the legislature must have intended sec. 100.26(3) to be in-

Third, as is explained more fully below, the legislature provided a multitude of civil remedies for violation of a regulation issued under sec. 100.20 in lieu of or in addition to criminal prosecution under sec. 100.26(3). The multitude of civil remedies indicates that the legislature intended criminal prosecution to be used to punish only "intentional" offenses.

Because the primary goal of sec. 100.26(3) is to punish the offender, I conclude that the legislature intended scienter to be an element of the crime.

*Effective enforcement of the law.* The larger the number of prosecutions expected or required to enforce the law, the more likely the legislature meant to impose liability without fault; the fewer the expected or required prosecutions, the more likely the legislature meant the prosecutor to prove scienter. LeFave & Scott, *Criminal Law* sec. 31, p. 220 (1972).

The legislature did not envisage a large number of criminal prosecutions under sec. 100.26(3) which had to be quickly processed. Quick criminal trials unhindered by proof of scienter are not needed for effective enforcement of sec. 100.20 or the regulations. The Wisconsin legislature has enacted a multitude of civil administrative and judicial remedies to enable the department of agriculture, trade and consumer protection, the department of justice, the district attorneys and the in-

terpreted as not requiring proof of scienter is not supported by the legislative intent expressly stated in other consumer statutes. The Wisconsin consumer act (chs. 421–427, Stats. 1979–80) is designed "to protect consumers against unfair, deceptive, false, misleading and unconscionable practices by merchants." A criminal sanction is provided for violation of chs. 421–427. The sanction is limited to a fine (not more than $2,000); no imprisonment may be imposed. And the fine may be imposed only on proof that the actor "wilfully and knowingly engages in any conduct or practice in violation of chs. 421 to 427 . . . ." Sec. 425.401, Stats. 1979–80.

jured parties to stop the prohibited practices and to afford relief to the injured parties.

The following provisions are remedies for violations of the regulations in lieu of or in addition to criminal prosecution under sec. 100.26 (3) :

(1) Sec. 100.20 (3), Stats., enables the department of agriculture, trade and consumer protection, after public hearing, to issue a special order, enjoining a person from employing unfair methods of competition or trade practices, or requiring the person to employ fair methods and practices.

(2) Under sec. 100.20 (4), Stats., the department of justice may file a written complaint with the department of agriculture, trade and consumer protection, alleging that unfair trade practices or unfair methods of competition have been employed by certain named persons. The department of agriculture, trade and consumer protection is required to hold an administrative hearing to adjudicate the matters alleged in the complaint.

(3) Sec. 100.24, Stats. provides that, upon proof of a substantial and willful violation of any special or general order issued, the attorney general may bring an action to enjoin any corporation, foreign or domestic, from doing business in the state or to cancel or revoke its certificate of authority, or incorporation.

(4) Any district attorney or the department of justice may, pursuant to sec. 100.26 (6), Stats., commence an action in the name of the state to recover a civil forfeiture of not less than $100 nor more than $10,000 for the violation of an order issued under sec. 100.20.

(5) The department of agriculture, trade and consumer protection may request the circuit court to restrain by temporary or permanent injunction the violation of any special or general order issued under sec. 100.20, and prior to entry of final judgment the court may in its discretion restore to any person any pecuni-

ary loss suffered because of the acts or practices of the contractor. *See* sec. 100.20 (6), Stats.

(6) Sec. 100.20 (5), Stats., provides a private legal remedy to the injured person of twice the pecuniary loss, together with costs and reasonable attorney's fees, for violations of special or general orders.

With this arsenal of weapons available to the state and the injured party against the violator, the argument that requiring proof of scienter in criminal prosecutions imposes severe difficulties in enforcement of the statute and regulations is not persuasive in the instant case. Further, administrative agencies ordinarily give warning to violators before criminal prosecution is instituted, and criminal prosecution is generally not undertaken by an administrative agency to catch those who are faultless but to penalize those who wilfully violate the law. Remington & Zick, *Liability Without Fault Criminal Statutes,* 1956 Wis. L. Rev. 625, 653. Therefore the violators normally chosen to be prosecuted are specifically those where some level of scienter could be proven relatively easily because of repeated violations. The violator in this case appears to fall within this category. Consequently, I conclude that the legislature intended to impose the severe criminal penalty possible under sec. 100.26 (3) only on those who "intentionally" violate a regulation.

For the reasons set forth, I conclude that the legislature intended that the word intentionally in sec. 100.-26 (3) modify the verbs refuses, neglects and fails.

## II.

The second question—and one not discussed by the parties or the majority—is what is meant by saying sec. 100.26 (3) provides for "strict liability," that is, that the defendant can be convicted even in the absence of fault. As one commentator notes, each criminal regulation

"must be examined to determine in what respects it is 'strict.'" Wasserstrom, *Strict Liability in the Criminal Law*, 12 Stan. L. Rev. 731, 742 (1960). Some of the regulations do seem to include an element of scienter, and some of the regulations do provide for defenses. See *State v. Clausen*, 105 Wis. 2d 231, 313 N.W.2d 819 (1982) (filed Jan. 1982).

The majority opinion waffles on what it means when it apparently holds that sec. 100.26(3) encompasses an "intentional" crime as well as a "strict liability" crime. After carefully concluding that "intentionally cannot modify fails" (*supra,* p. 269), the majority opinion goes on to suggest that nevertheless scienter is always an element of the offense, saying "the wrongdoing punished is either an 'intentional refusal' or 'neglect' or 'failure,' all of which suggest in varying degrees, direct or implied knowledge of a wrongdoing." *Supra,* p. 277.

If the word "intentionally" modifies "fails," as I have concluded, the issue is what does "intentionally" mean. As the United States Supreme Court observed recently in *United States v. Bailey,* 444 U.S. 394, 403, 100 S. Ct. 624, 630 (1980), "few areas of criminal law pose more difficulty than the proper definition of the *mens rea* required for any particular crime." Just as "strict liability" may have different meanings, especially when the regulations cover a multitude of acts and actors, the word "intentionally" may have different meanings. I suggest that the word "intentionally" in the present statute is used much as the word "wilfully" was used in the 1923 version of sec. 100.26(3).

One commentator pointed out recently that there are at least seven variations in the meaning and scope of the term wilful in the federal regulatory and corporate areas:

"(1) knowledge of illegality, or an intent to further an objective known to be illegal;

" (2) recklessness as to legality;

" (3) negligence as to legality;

" (4) immoral objective, or knowledge of immorality— such as 'bad purpose,' 'evil intent,' and 'conscious wrong-doing';

" (5) intent to defraud or injure;

" (6) intent or knowledge with respect to ordinary elements of the offense; and

" (7) recklessness with respect to ordinary elements of the offense." Feinberg, *Toward a New Approach to Proving Culpability: Mens Rea and The Proposed Federal Criminal Code,* 18 Am. Cr. L. Rev. 123, 127 (1980).

As to the two regulations in issue in the case at bar, the word "intentionally" might be interpreted to mean knowledge of illegality or recklessness as to illegality or negligence as to legality.

## III.

The defendant argues that if the statute does not require scienter the statute violates due process. The majority apparently rejects this argument quoting at length various cases that have upheld strict liability statutes. I recognize that this court has, as have many federal and state courts, upheld the constitutionality of legislative acts creating crimes without a requirement of intent. *Chicago B. & Q. Ry. Co. v. United States,* 220 U.S. 559, 578 (1911); *State v. Dried Milk Products Co-op.,* 16 Wis. 2d 357, 359, 114 N.W.2d 413 (1962); *State v. Collova,* 79 Wis. 2d 473, 480, 255 N.W.2d 581 (1977); LaFave & Scott, *Criminal Law* sec. 32, pp. 221–222 (1972). Nevertheless the majority errs in intentionally neglecting to acknowledge that many courts and commentators have expressed misgivings about the constitutionality of strict liability statutes and that courts have recognized that due process may be violated when

imprisonment and the stigma of a conviction are imposed on acts done innocently.[18]

In *United States v. Int'l Minerals & Chemical Corp.*, 402 U.S. 558, 564–565 (1971), which involved regulation of shipment of dangerous acids, the United States Supreme Court recognized that imposing criminal sanctions for regulating violations concerning non-dangerous products without requiring *mens rea* might raise due process problems. The Court said:

"Pencils, dental floss, paper clips may also be regulated. But they may be the type of products which might raise substantial due process questions if Congress did not require, as in *Murdock*, 'mens-rea' as to each ingredient of the offense."

The rule to be derived from the decisions of the United States Supreme Court dealing with scienter and due process can be stated as follows: *"Mens rea is an important requirement, but it is not a constitutional requirement, except sometimes."* Packer, *Mens Rea and the Supreme Court,* 1962 The Supreme Court Review 107.[19]

---

[18] *Cf. Lambert v. California,* 355 U.S. 225 (1957), where the United States Supreme Court struck down a strict-liability criminal statute on due process grounds. Fair play requires that before a person be subject to imprisonment, the person receive notice of the fact that the conduct is *malum prohibitum.* In *Lambert* the defendant had violated the statute merely by being a convicted felon and not registering with the police. She had lived in Los Angeles for years. Under the statute her passive status resulted in a violation if she did not register. Therefore there was nothing to put the defendant on notice that she was violating a statute. *See also United States v. Mancuso,* 420 F.2d 556, 559 (2d Cir. 1970).

[19] Professor Perkins has written that "the time has come to recognize that there has been a violation of due process whenever there has been any deprivation of liberty or property resulting from a conviction based upon liability without fault." Perkins, *Criminal Law* 811 (2d ed. 1969).

For an interesting analysis of recent United States Supreme Court cases in regard to the question whether due process re-

While statutes creating strict liability crimes have been upheld on numerous occasions there appear to be limits, constitutional limits beyond which the legislature cannot go. Courts have struck down statutes creating strict liability crimes as violating due process, reasoning that these statutes are vague and lack notice, *State v. Prince,* 52 N.M. 15, 189 P.2d 993 (1948) ; that these statutes create an unreasonable and arbitrary conclusive presumption of scienter and arbitarily attach criminal responsibility, *People v. Nangapareet,* 210 N.Y.S.2d 446 (Sup. Ct. 1960) ; that these statutes are an unreasonable and arbitrary exercise of the police power, *People v. Estreich,* 75 N.Y.S.2d 267, 272 App. Div. 698 (1947). Admittedly the exact constitutional limits on the legislature's defining the elements of a crime are not clear. But the majority errs by not directly confronting the issue of whether it recognizes any constitutional limitations on the legislature creating strict liability crimes.

Professor Packer concludes that one of the major flaws in the jurisprudence concerning mens rea is that courts have consistently avoided trying to define the constitutional limits of the problem by employing the conclusory label, "public welfare offense." Packer, *Mens Rea and The Supreme Court,* 1962 The Supreme Court Review 149–52. The majority by not tackling the constitutional issue raised by its holding that scienter is not an element of the offense does nothing to provide future guidance for the legislature, litigants or the courts. For even if it is difficult to analyze the inter-

quires mens rea to be an element of a crime, *see* Tushnet, *Constitutional Limitations of Substantive Criminal Law: An Examination of the Meaning of Mullaney v. Wilbur,* 55 B.U.L. Rev. 775 (1975). *See also* Saltzman, *Strict Criminal Liability and the United States Constitution: Substantive Criminal Law Due Process,* 24 Wayne L. Rev. 271 (1978).

relation of scienter and due process, this court should try to begin to define the limits, if any, on the legislature's power to define a crime.

In summary, the public policy of this state is that mens rea is the rule in criminal statutes, strict liability is the exception. Sec. 100.26 (3) imposes a heavy penalty and a serious stigma on a violator. The rules of the department of agriculture, trade and consumer protection under sec. 100.20 have expanded from six special and general orders covering three and one-half printed pages in 1940 (the first time the orders of the state administrative agencies were printed in one volume) to several chapters of rules covering many printed pages in the present state administrative code. I can find no countervailing factors to move me to limit the word intentionally to modify only "refuses" and to construe the statute as one of strict liability. I conclude that the legislature intended in sec. 100.26 (3) to subject to criminal penalty only those who "intentionally" violate the department's numerous rules issued pursuant to sec. 100.20.

Despite this court's recognition that "the element of scienter is the rule rather than the exception in our criminal jurisprudence," despite the legislature's express incorporation of the element of scienter in sec. 100.26 (3), despite the majority's concession that the statute may reasonably be interpreted to require scienter, despite the severity of the penalty and despite the fact that speedy enforcement of the regulations which are extensions of common law criminal fraud are not necessary to protect the public welfare, the majority concludes that the word "intentionally" modifies only the verb "refuses" and that the statute does not require scienter to be proved in every prosecution. Further, without analysis of the due process issue, the majority holds the "strict liability" statute constitutional. I dissent.